BOHN SASH & DOOR COMPANY ET AL., APPELLANTS, V. HENRY O. CASE ET AL., APPELLEES.

FILED OCTOBER 16, 1894.  No. 5524.

1. **Mechanics' Liens**: RIGHTS OF SUBCONTRACTOR: TIME TO FILE CLAIMS.  The statute gives a certain time for filing a claim for a lien by a subcontractor, and the mere fact that a subcontractor has postponed the filing of his lien till toward the end of the time limited for that purpose, will not interfere with his said statutory right, no matter what may have been his motive.

2. ———: MORTGAGES: SUBROGATION.  The right of subrogation for moneys loaned on a mortgage used to pay prior mortgages must be predicated upon some recognized equitable principle, such as mistake, an agreement or understanding that the loan was for the express purpose designated, or the like.  The mere fact that with the proceeds of a later mortgage prior mortgages have been paid that the lien of them might be removed affords no ground for subrogation thereto.

3. ———: CLAIM AGAINST SEPARATE PROPERTIES.  Under an entire contract for the erection of buildings on lots not contiguous to each other, one claim for a mechanic's lien may properly be filed against both improved properties where the claimant of such lien has contributed material or labor to both improvements.

APPEAL from the district court of Douglas county. Heard below before DOANE, J.

The facts are stated by the commissioner.

*B. G. Burbank*, for Bohn Sash & Door Company :

The lower court was not justified, under the law and the evidence, in postponing the mechanic's lien of the Bohn Sash & Door Company to the mortgage lien of Jeffries & Sons, trustees, and certain mechanics' liens. The doctrine of estoppel does not apply. (*De Nayer v. State Nat. Bank*, 8 Neb., 108; *Mills v. Graves*, 38 Ill., 455; *Commonwealth v. Moltz*, 10 Pa. St., 527 ; *Crest v. Jack*, 3 Watts [Pa.], 238; *Hepburn v. McDowell*, 17 Serg. & R. [Pa.], 383 ; *Wallis v. Truesdell*, 6 Pick. [Mass.], 455; *Whitney v. Holmes*, 15 Mass., 152; *Miller v. Cresson*, 5 Watts & S. [Pa.], 284; *Welland Canal Co. v. Hathaway*, 8 Wend. [N. Y.], 480 ; *Carter v. Darby*, 15 Ala., 696 ; *Newman v. Hook*, 37 Mo., 207; *Dezell v. Odell*, 3 Hill [N. Y.], 219 ; *Taylor v. Zepp*, 14 Mo., 482; *Simpson v. Pearson*, 31 Ind., 1 ; *Plumer v. Lord*, 9 Allen [Mass.], 455; *Audenried v. Betteley*, 5 Allen [Mass.], 382; *Howard v. Hudson*, 2 El. & B. [Eng.], 1; *Burnell v. Maloney*, 39 Vt., 579; *Mills v. Graves*, 38 Ill., 455; *Gordon v. Torrey*, 15 N. J. Eq., 112.)

The doctrine of subrogation does not apply in favor of John Jeffries & Sons, trustees. (*Shinn v. Budd*, 14 N. J. Eq., 237; *Nolte v. Creditors*, 9 Martin [La.], 89 ; *Curtis v. Kitchen*, 8 Martin o. s. [La.], 706; *Bank of United States v. Winston*, 2 Broch. [U. S. C. C.], 254; *Gadsden v. Brown*, 1 Speer Eq. [S. Car.], 41; *Sandford v. McLean*, 3 Paige Ch. [N. Y.], 122 ; *Hayes v. Ward*, 4 Johns. Ch. [N. Y.], 130 ; *Banta v. Garmo*, 1 Sandf. Ch. [N. Y.], 384 ; *Wilkes v. Harper*, 1 Comst. [N. Y.], 586 ; *Swan v. Patterson*, 7 Md., 164 ; *Copio v. Middleton*, 1 T. & R. [Eng.], 224 ; *Hodgson v. Shaw*, 3 Myl. & K. [Eng.], 183 ; *Williams v. Owen*, 5 Myl. & Cr. [Eng.], 597 ; *Bowker v. Bull*, 1 Simons n. s. [Eng.], 29 ; *Downer v. Wilson*, 33 Vt., 1 ; *Marvin v. Vedder*, 5 Cow. [N. Y.], 676.)

*William S. Curtis*, for W. B. Millard:

The lien of James F. Morton should be declared subordinate to the mortgage lien of W. B. Millard.

The liens of George A. Hoagland, J. L. Coughlin, Edward C. Tighe, Omaha Oil & Paint Company, and Carl Bradley should be declared void. (Phillips, Mechanics' Liens [2d ed.], secs. 376, 377; *Fitzgerald v. Thomas*, 61 Mo., 502; *Culver v. Elwell*, 73 Ill., 536; *Davis v. Alvord*, 94 U. S., 545; *Morris County Bank v. Rockaway Mfg. Co.*, 16 N. J. Eq., 150; *Beckel v. Petticrew*, 6 O. St., 247; *Hill v. Braden*, 54 Ind., 72; *Hill v. Ryan*, 54 Ind., 118.)

The payments of two thousand dollars made on the George A. Hoagland account should be credited upon the material furnished for the Twenty-fifth street block. (Phillips, Mechanics' Liens [2d ed.], sec. 289; *Beckel v. Petticrew*, 6 O. St., 247.)

*Switzler & McIntosh*, for George A. Hoagland and Charles A. Harvey:

Where the contract is in gross for material furnished for all houses, the lien attaches to all for the amount due. (*Chadbourn v. Williams*, 71 N. Car., 444; *Sergeant v. Denby*, 12 S. E. Rep. [Va.], 402; *Bowman Lumber Co. v. Newton*, 72 Ia., 90; *Lewis v. Saylors*, 73 Ia., 504; *Fullerton v. Leonard*, 52 N. W. Rep. [S. Dak.], 325; Phillips, Mechanics' Liens, sec. 369; *Doolittle v. Plenz*, 16 Neb., 153; *Batchelder v. Rand*, 117 Mass., 176.)

The lien dates from the delivery of the first material. (Sec. 2157, Con. Stats; *Courtney v. Insurance Co. of North America*, 1 C. C. A., 249; *Ansley v. Pasharo*, 22 Neb., 662.)

Where a mortgage is given by owner of premises after delivery of a part of material, under a contract for delivery of still other material, for erection of buildings, such mortgage is junior and inferior to lien of material-man for all

goods furnished under said contract, both prior and subsequent to execution of the mortgage. (*Batchelder v. Rand*, 117 Mass., 176; *Courtney v. Insurance Co. of North America*, 1 C. C. A., 249; *Stout v. Sower*, 22 Ill. App., 65; *Morse v. Dole*, 73 Me., 351.)

*Cook & Gossett*, for John Jeffries & Sons:

The appellants' lien should not be allowed, because it is not so itemized as to comply with the mechanics' lien law, and because it is so grossly exaggerated in amount as to show intentional fraud in the claim it asserts. (*Noll v. Swineford*, 6 Pa., 187; *Carson v. White*, 6 Gill [Md.], 17; *Thomas v. Barber*, 10 Md., 381; *McDonald v. Rosengarten*, 134 Ill., 126; *Rude v. Mitchell*, 97 Mo., 372; *Graves v. Pierce*, 53 Mo., 423; *McWilliams v. Allan*, 45 Mo., 573; *Coe v. Ritter*, 86 Mo., 287; *Shackleford v. Beck*, 80 Va., 576; *Cannon v. Williams*, 14 Col., 21; *Lynch v. Cronan*, 6 Gray [Mass.], 531; *Hoffman v. Walton*, 36 Mo., 613; *Gibbs v. Hanchette*, 51 N. W. Rep. [Mich.], 691; *Foster v. Schneider*, 2 N. Y. Sup., 875; *Whitenack v. Noe*, 11 N. J. Eq., 321; *Reeve v. Elmendorf*, 38 N. J. Law, 125; *Stubbs v. Clarinda College Springs & S. W. R. Co.*, 65 Ia., 513.)

Appellants' lien, even if allowed, should be postponed to the Myers mortgage.

The ruling of the court in regard to the subrogation of the Myers mortgages to the lien of those which the money was used to pay off was right and consistent with sound principles of equity and justice. (*Blodgett v. Hitt*, 29 Wis., 169; *Valle v. Fleming*, 29 Mo., 152; *Levy v. Martin*, 48 Wis., 198; *Wilton v. Mayberry*, 75 Wis., 191; *Plapp v. Meyer*, 40 Ia., 705; *Johnson v. Barrett*, 117 Ind., 551; *Gilbert v. Gilbert*, 39 Ia., 657; *Crippen v. Chappel*, 35 Kan., 495; *Perry v. Adams*, 98 N. Car., 167; *Fears v. Albea*, 69 Tex., 437; *Walker v. King*, 44 Vt., 601; *Wheeler v. Willard*, 44 Vt., 640; *Robinson v. Urquhart*, 12 N. J. Eq., 524; *Tradesmen's Building Association v. Thompson*,

32 N. J. Eq., 133; *Coe v. New Jersey M. R. Co.*, 31 N. J. Eq., 105; *Payne v. Hathaway*, 3 Vt., 212; *Trenton Bank Co. v. Woodruff*, 2 N. J. Eq., 117; *Bruse v. Nelson*, 35 Ia., 157; *Price v. Davis*, 14 S. E. Rep. [Va.], 704; *Emmert v. Thompson*, 52 N. W. Rep. [Minn.], 31; *Hobgood v. Schuler*, 10 So. Rep. [La.], 812; Pomeroy, Equity Jurisprudence, sec. 1212.)

*E. R. Duffie*, for E. C. Tighe.

*Meikle & Perley, F. A. Brogan, Bradley & De Lamatre, Mahoney, Minahan & Smyth, M. S. Lindsay, Chas. E. Clapp, Leavitt Burnham, J. W. Houder, McCoy & Olmsted, Tunnicliff & Page, Congdon & Clarkson, Edgar S. Bradley, Wharton & Baird, Brown & Talbott, De France & Richardson, Henry W. Pennock, Clinton N. Powell, Cornish & Robertson, Parke Godwin, A. C. Read, Montgomery, Charlton & Hall, Kennedy & Learned*, and *J. J. O'Connor*, for other appellees.

RYAN, C.

The Bohn Sash & Door Company, M. A. Disbrow, and George A. Hoagland each began a separate action for the foreclosure of a mechanic's lien in the district court of Douglas county. These three cases were consolidated and tried as one, and upon final hearing a decree was rendered granting each plaintiff and cross-complainant relief, though not in each instance in the measure prayed. The facts out of which arose the controversy adjusted by the above decree were, in substance, as follows: On the first of October, 1889, William J. Paul, one of the defendants, was the owner and in possession of the following described real property: Lots 3 and 4, in block 1, in Capitol Hill Addition to the city of Omaha, being a tract of land situate at the northeast corner of Twenty-sixth and Harney streets in said city, and hereinafter mentioned and called the

"Twenty-sixth street property;" also the north 120 feet
of a subdivision of lot 13 of lot 6, in Capitol Hill Addi-
tion to the city of Omaha, being a tract of land situate at
the southeast corner of Twenty-fifth and Harney streets and
hereinafter mentioned and called the "Twenty-fifth street
property." These tracts were separated from each other by
the space of an intervening block or more. On the 9th
day of October 1889, William J. Paul entered into a
written contract with the firm of Case & Kennedy, by the
terms of which Case & Kennedy undertook to construct a
block of ten contiguous residences on said Twenty-sixth
street property, and also a block of five contiguous resi-
dences on the Twenty-fifth street property. By the terms
of this contract the firm of Case & Kennedy were to per-
form all work and furnish all material necessary to con-
struct the aforesaid two blocks according to plans and
specifications agreed on, in payment for which the said firm
was to receive $51,650 in money and real property, to be
conveyed at an agreed price. Immediately the erection of
the Twenty-fifth street property was begun, and afterwards,
in 1890, the building contemplated was commenced on the
Twenty-sixth street property. Afterwards there was com-
pleted the block on Twenty-fifth street. That on Twenty-
sixth street was never finished. For the satisfaction of the
unpaid claims of subcontractors under Case & Kennedy,
and of mortgages on the properties on Twenty-fifth and
Twenty-sixth streets, foreclosure proceedings were begun,
and because some of the causes of action affected both prop-
erties, the consolidation hereinbefore referred to was ren-
dered indispensably necessary. The decree fixed the pri-
orities of the several claimants and directed a sale of the
property on Twenty-sixth street and Twenty-fifth street re-
spectively, directing the application of the proceeds of sale
of each property to be made to such parties as were respect-
ively entitled to liens thereon. While there were thirty-
two parties whose rights were thus determined, there has

been an appeal taken by but six, and to a consideration of these appeals alone need our attention be directed.

Before the contract was made for the erection of the block of buildings on the Twenty-sixth street property, that property had been mortgaged by a former owner, one Andrew J. Rosewater, to John P. Schoning, who had assigned his mortgage to the Omaha Savings Bank. By this mortgage there was secured the payment of three promissory notes for $5,022.22 each, but one of these notes meantime had been paid. On the Twenty-sixth street property William J. Paul, on May 1, 1888, made another mortgage to secure payment of his promissory note for $6,500, held by J. H. Millard, trustee. On the 27th of May, 1890, William J. Paul executed to W. B. Millard, trustee, a mortgage on the Twenty-sixth street property to secure payment of his note for $10,000, due August 27 following. On the 13th day of June, 1890, said Paul made another mortgage on the Twenty-sixth street property to W. B. Millard, trustee, for $5,000, due in ninety days after date. Each of said mortgages was duly recorded. On July 7, 1890, Mahoney & Co. filed a subcontractor's claim for a mechanic's lien for $178.85. So far as is shown by the record this was the condition of the Twenty-sixth street property when, in July, 1890, Mr. Paul applied to the Omaha agent of the Kansas City Loan Company for a loan thereon to be made by Willis G. Myers. This loan was afterwards effected, and with a part of the proceeds thereof there were paid on the mortgages above referred to the following sums, to-wit: To the Omaha Savings 'Bank, $11,203.91; to J. H. Millard, $6,933.74; to W. B. Millard, $16,258.91. Mr. Myers procured the release of these mortgages of record, and forebore to take any assignment of them; but, in consideration of the fact that the loan was effected for the purpose of taking up these mortgages, the district court subrogated Mr. Myers to the rights of the holders of the original mortgages which he had paid

with the proceeds of the loan made by him to Paul. This
right of subrogation will be considered later. Incidentally,
however, to this loan there arose other questions, which by
the district court were held of sufficient importance to post-
pone the lien of the Bohn Sash & Door Company and Ed-
ward C. Tighe to the lien of the mortgage for $35,000 held
by Myers. This mortgage, after it had been recorded, was
transferred, with the bond which it secured, to Jeffries &
Sons, who were parties to the foreclosure proceedings in he
district court. The lien of the Bohn Sash & Door Com-
pany for $3,331.67, with which we have to deal, was for
material furnished between March 1 and July 30, 1890.
In like manner we must consider the claim of Edward C.
Tighe for labor performed and material furnished between
the 25th day of November, 1889, and the 5th day of Au-
gust, 1890, to the amount of $844.03.

1. The district court, after describing the manner in
which the loan of $35,000 was made and expended, made the
following findings as to the Bohn Sash & Door Company
and Edward C. Tighe: "That the Bohn Sash & Door
Company, by its officers and agents, had knowledge that
the said William J. Paul was negotiating and endeavoring
to procure said loan, and the making to and acceptance by
said Myers of said note and mortgage before the same was
actually made, and while the said Paul was negotiating
with the said Myers to obtain said loan, and although in-
tending at that time to file said claim as a lien upon said
premises, the said company, at the request of and by collu-
sion with said Paul, withheld its claim against said premises,
and the lien filed by it as aforesaid, until about the time
said loan was made and the said note and mortgage exe-
cuted and accepted by the said Myers, for the purpose of
enabling the said Paul to procure said loan and the accept-
ance thereof, to and with the intent of concealing, and did
conceal, from the said Myers the fact that they had or
claimed any lien upon said premises until said loan should

be made, and did not file said lien until they knew said loan had been made." As to Edward C. Tighe, the findings were the same as those above set out with reference to the Bohn Sash & Door Company. On account of the facts found as above stated and described with reference to the Bohn Sash & Door Company and Edward C. Tighe, it was decreed by the district court that their liens as subcontractors should be postponed to the lien of Jeffries & Sons, and as Jeffries & Sons had liens in the third, seventh, and ninth classes, the result was that the Bohn Sash & Door Company and Edward C. Tighe's claims were adjudged to belong to the tenth class. As the first origin of the claim of the Bohn Sash & Door Company was March 1, 1890, and that of Edward C. Tighe was of date November 25, 1889, it is evident that under the rule laid down in *Henry & Coatsworth Co. v. Fisherdick*, 37 Neb., 207, the Bohn Sash & Door Company and Edward C. Tighe have, by the aforesaid special findings of the district court, been placed in a rank which, but for those findings, they should not have occupied. We have carefully considered the evidence in support of the findings of the district court, and are unable to discover any fraud or deceit practiced by either the Bohn Sash & Door Company or Edward C. Tighe, or the attorneys or agents of either of these parties. The testimony simply shows that these claims were called to the attention of Mr. Case and Mr. Paul and that a request was made that the claims for liens should not be filed until later, for, it was said, Mr. Paul was obtaining a loan out of which these claims should be paid, and that if the claims were filed before that loan was made, it would interfere with, and perhaps prevent, its consummation. Acting on this suggestion, the claims of these parties were not filed until nearly the expiration of the sixty days given by law for that purpose. There was, however, no communication between any agent or officer of the Bohn Sash & Door Company and Willis G. Myers, or his agent; neither was there

23

any communication between Edward C. Tighe and said Myers, nor was Myers by either party in any way led to consummate the loan by reason of the claim being withheld from record as above described. It was simply a case where the holder of a right to a lien, a subcontractor, was given sixty days by law within which his lien should be filed. The filing of such a lien would be just as operative and effective on the fifty-ninth day as though filed sooner. We are unable to discover, in withholding these claims from the record until nearly the close of the sixty days provided by law, without meantime any inducement having been offered for the consummation of the loan by either holder of the liens, that there was any fraud or any improper conduct on the part of either the Bohn Sash & Door Company or Edward C. Tighe. The evidence shows that Mr. Myers knew that the building was in course of construction and that he nevertheless made no inquiry as to whether or not the subcontractors had been paid; but the evidence does show that he had confidence in the financial ability of Case & Kennedy. In addition to this, a bond was taken as indemnity against any liens being filed in the nature of those held by the Bohn Sash & Door Company and Edward C. Tighe, and from all these considerations we are led to the conclusion that the withholding of these liens from the record in no way fraudulently induced the consummation of the loan of $35,000. Considered solely with reference to the time at which the Bohn Sash & Door Company's lien for $3,331.67 had its origin, and the date at which began the claim of Tighe (November 25, 1889), these liens should have ranked with that of Mahoney & Co.; that is to say, should have been in the second class, and superior to all rights of Jeffries & Sons under the mortgage assigned to them by Myers.

2. It is insisted, however, and the district court so found, that Jeffries & Sons are entitled to be subrogated to the rights of certain mortgagees whose mortgages were paid

out of the proceeds of the mortgage for $35,000. The first of these was for the amount of the two notes of Andrew J. Rosewater, held by the Omaha Savings Bank, amounting to $11,203.91; the other was the mortgage of Paul to Rosewater, assigned to J. H. Millard, which was discharged by the payment of $6,933.74. The sum total of these two mortgages—probably with some accrued interest—the court found was $19,770.09, and decreed the same the third lien on the Twenty-sixth street property. The inducements upon which Jeffries & Sons predicate their right to subrogation as to these amounts are thus stated in the brief filed on their behalf: "To induce the making of said loan he (Paul) represented that he held the title to the property; that the only liens against it were the four mortgages above mentioned and the mechanic's lien of Mahoney & Co., the amount and validity of which were in dispute; that he had paid some $20,000 in cash on the building then in progress of construction and had arranged for the payment of the balance with real estate; that the contractors were solvent and responsible; that his contract for such payments was valid and enforceable, and that the contract would be carried out; that no other indebtedness then existed or could arise for work or materials which could become a lien thereon, and upon the release of the four mortgages then upon the property, his mortgage for the proposed loan would be a first lien upon the property, prior to any claims, actual or contingent, against it. Relying upon these representations, Myers agreed with Paul and the holders of the four mortgages to make the loan of $35,000 on Paul's note and a mortgage on the Twenty-sixth street property, and with the proceeds pay to the Omaha Savings Bank $11,203.91, the amount of the first mortgage; to J. H. Millard, $6,933.74, the amount of the second mortgage; to William B. Millard, $16,258.91, the amount of the third and fourth mortgages. He procured the release of these mortgages of record and forebore to

take any assignment of them for the reason that he believed and relied upon Paul's representations above stated. On August 19, 1890, his mortgage was recorded; the four prior mortgages were paid off with the proceeds of the loan, and thereupon the mortgage to Myers appeared as a first lien, except as to the claim of Mahoney & Co."

We are now confining our attention to the discharged mortgage held by the Omaha Savings Bank, and to that held by J. H. Millard, for the reason that the third and fourth mortgages, being those to William B. Millard, were filed later than the inception of the lien of the Bohn Sash & Door Company and of Edward C. Tighe, and it matters not, therefore, whether or not there was subrogation as to these last named mortgages, for if subrogated the party so entitled would only find himself holding a lien junior and inferior to that of the Bohn Sash & Door Company and Edward C. Tighe. In each of the cases cited to sustain the right of subrogation there was a recognized equity upon which to found that right. For instance, in the case of *Blodgett v. Hitt*, 29 Wis., 169, land had been sold at administrator's sale. The notice of the sale was insufficient and the proceedings void, and the heirs of the deceased were entitled to the land. It was held, however, that the money which the purchaser paid, having been used to pay off a mortgage on the land and other debts of the ancestor which the heirs would have been obliged to pay in order to hold their inheritance, it was but equitable that the purchaser should be subrogated to the lien of the mortgagee and to the rights of all creditors whose claims had been discharged. What was regarded as the pivotal inquiry in that case is indicated by the following language quoted from the opinion: "But the question is not, alone, what is the natural and inherent justice of the case? but it is, are the principles and rules of equity jurisprudence, as recognized and enforced by courts of equity, sufficiently broad and comprehensive to reach the case and compel the heirs to repay

the sums which the defendant has thus paid for their bene-
fit before they will be permitted to take possession of the
land in controversy?" It will be noted in this language
that the conclusion reached could not have been attained
alone on the consideration of what is the natural and in-
herent justice of the case, but it was required that there should
concur with this some well recognized principle of equity
jurisprudence which would compel the heirs to repay the
sums which the defendant had paid out for their benefit.
The consensus of all the cases cited to sustain the subroga-
tion in favor of Jeffries & Sons is that there must exist
the equitable principle just noted. In some instances this
equitable principle forbids that heirs shall profit by invalid
administrators' sales made under misapprehension, causing
such invalidity. So, where money has been advanced by
way of loan or otherwise because of misconception of the
condition of the title, it has been held that there should
exist the right of subrogation to the mortgage or other se-
curity released by payment of the money advanced. Of
this class was *Betts v. Sims,* 35 Neb., 840. In all the cases,
however, it is noticeable that there exists a sufficient basis
for equitable relief. In some it is because of mistake,—a
well recognized equitable ground for the interference of
courts, irrespective of whether there is involved the right
of subrogation or some other right. In another class of
cases there exists the right of subrogation because of the in-
tent with which loans have been made for the payment of
prior mortgages. Of the class just mentioned, the case of
*Emmert v. Thomas,* 52 N. W. Rep. [Minn.], 31, is an ex-
ample. Because in this case there is concisely stated the
conditions necessary to entitle to subrogation of the nature
just mentioned, the following language is quoted: "The
better opinion now is that one who loans his money upon
real estate security for the express purpose of taking up
and discharging liens or incumbrances on the same property,
has thus paid the debt at the instance, request, and solicita-

tion of the debtor, expecting and believing in good faith
that his security will of record be substituted in fact in
place of that which he discharges, is neither a volunteer,
stranger, nor intermeddler, nor is the debt, lien, or incum-
brance regarded as extinguished if justice requires that it
should be kept alive for the benefit of the person advanc-
ing the money who thereby becomes the creditor." If Jeff-
ries & Sons were properly entitled to subrogation as decreed
by the district court, it must have been upon the application
of the principles just quoted, for they are most nearly ap-
plicable.

Let us now consider the evidence of Mr. Pease, who was
the agent through whom the $35,000 loan was made. He
testified as follows: "In 1890 I was the representative of
the Kansas City Investment Company at Omaha, and ne-
gotiated the mortgage with William J. Paul on the prop-
erty at the corner of Twenty-sixth and Harney streets, in
the city just mentioned. This mortgage was taken in the
name of Willis G. Myers. I examined the property at
the time I made the loan, and made an estimate of its value.
I also examined the records, or had them examined, in re-
gard to the condition of the title. Only one mechanic's
lien of a small amount appeared against the property, if I
recollect right, for about $100. I entered into as particular
inquiry as I could and asked all the questions of Mr. Paul
that pertained to the subject; and he informed me and
made figures to show that the amount of the loan we were
making,—that the balance above that was to be paid out,
that the prior mortgages would pay all the incumbrances
up,—all the liens; that they were provided for, all the
larger ones were provided for, and that there would be
cash enough come out of the loan to pay the balance.
He said he had paid the contractor $16,000 in cash, if I
recollect right, and that they were to take real estate to the
amount of the balance that was coming to them. He had
arranged to sell them certain real estate; that they should

take certain lots, and told me what they were. I do not recollect now, but there was no more money coming to them. I do not think that the subject of the solvency of Case & Kennedy was raised. There was no question in my mind about the solvency of Case & Kennedy. I don't think there was any doubt as to their solvency at that time. These negotiations were carried on for about thirty days previous to the filing of their mortgage, probably five or six weeks; and they were continued up to the time of the filing of the mortgage to pay off all prior mortgages. I paid off the prior incumbrances, except the mechanic's lien. That was a matter of dispute between the men and Mr. Paul. There was money still in my hands to take care of that. At no time before the making and recording of the mortgage did Mr. Paul give me any intimation that a mechanic's lien was filed or any demand made upon which any mechanic's lien would be filed. I relied upon his statement that the payments of the building were provided for. I never would have made the loan in this case if I had known that as a matter of fact the subcontractors had not been paid the amount of five or six or seven or eight thousand dollars. I paid three mortgages with accrued interest, amounting to three thousand and some hundred dollars. [In this connection the witness described the mortgages held by J. H. Millard and the Omaha Savings Bank.] The note I took of Mr. Paul was sold to John Jeffries & Sons, trustees. It was for $35,000. Before I made the loan I personally looked over the property. The buildings were partially finished on the inside. It was finished in part. I think they were up and inclosed. Some of them were entirely finished, and others partly. I cannot say that I knew who the contractors were on the building. Mr. Paul told me,—in fact showed me his contract. I did not ask Case & Kennedy whether they had received their pay. I knew nothing about the subcontractors. I did not go to them. As to their re-

sponsibility, or as to whether they had been paid, all my information came from Mr. Paul. I saw a release made of two of the mortgages. The parties holding the mortgage, the third one, had to await Mr. J. H. Millard's return from Europe. Part of our contract was to take up these mortgages. I would not have paid them without their being satisfied of record. The object in having these mortgages released was to give me a mortgage of $35,000 against and over which no other mortgages would be of record for priority. The prior mortgages were destroyed for the purpose of making this the first mortgage on the property. We did not take anything but a first mortgage. Mr. Paul told me that arrangements had been made for the other liens in addition to these mortgages. When he borrowed the money everything was provided for. I believed that and made the loan relying upon it. I saw the property mortgaged on dozens of occasions myself. I saw it two or three times before this examination, when the president of the company was with me. The date of the mortgage was August 1. I cannot tell whether I saw the property after the 25th of July prior to seeing it in August, the date of the mortgage. I saw it on a great many occasions. I was up there several times. I cannot tell you the date of any visit to the property. I lived on Twenty-fifth street at that time and I saw the property frequently. There was no money paid on the mortgage until after it was acknowledged, I presume. I believe the contractors were continuing work on the property on the date on which the mortgage was acknowledged. There was somebody at work all the time, I think. When I made the examination with Mr. Holmes there were several men at work on the inside finish of the house, and it is my recollection that that was about three weeks prior to the first of August. I had no occasion to make any inquiry to ascertain whether or not there was anybody at work on the house, or ascertain whether Case & Kennedy were at work on the house at the time when

the mortgage was acknowledged." In this evidence there is no such mistake shown as would afford grounds for equitable relief. It is true Mr. Pease testified that he relied upon the representations of Mr. Paul as to the manner in which payments would be made and had been provided for, and that he believed the statement that no mechanic's lien, except one as to which there was a dispute, had been or would be filed. He admits, however, that he knew that the buildings were in course of erection, but that he on that account made no inquiry of such parties as were supplying the material or doing the work of constructing. The rule as to what Mr. Pease was bound to ascertain and know is thus stated in the fourth paragraph of the syllabus of the case of *Henry & Coatsworth Co. v. Fisherdick*, 37 Neb., 207: "A party taking a mortgage on real estate is bound at the time to know whether material has been furnished or labor performed in the erection, reparation, or removal of improvements on the premises within the four prior months." The language quoted was used specially with reference to principal contractors, but it is equally applicable to subcontractors. Since it was the duty of Mr. Pease to ascertain what liens not appearing of record had existence by reason of the condition of the work in progress, he could not relieve himself of the effect of the knowledge which proper inquiry would have developed, by refusing or failing to make that inquiry. The constructive notice imparted by the building operations were as effective within the time allowed for filing mechanics' liens as would have been after the actual filing. Had there been on file the liens of the Bohn Sash & Door Company and of Edward C. Tighe, there could be no doubt that the mortgage taken by the agent Pease for money used to discharge prior mortgages would have entitled him to no subrogation because of a mistake as to the condition of the title. Equally it must result that, under the circumstances disclosed in his testimony, the mortgage taken by him was

not taken because of a mistake as to the rights of these subcontractors. There is no equitable right of subrogation shown on the ground of mistake. The evidence of Mr. Pease leaves no room for doubt that the payment of the mortgages prior to that taken by him in favor of Myers was made simply to remove and cancel those incumbrances, so that thereby the mortgage for the security of the $35,000 should be the first lien. It is not enough to entitle to subrogation that with the proceeds of the Myers mortgage prior mortgages have been discharged. "The real question in all such cases is whether the payment made by the stranger was a loan to the debtor through a mere desire to aid him or whether it was made with the expectation of being substituted in the place of a creditor. If the former is the case, he is not entitled to subrogation; if the latter, he is" (*Tradesmen's Building Association v. Thompson*, 32 N. J. Eq., 133); citing *Coe v. New Jersey M. R. Co.*, 4 Stew. [N. J.], 105, 106. We conclude, therefore, that no good reason has been shown for the subrogation of Jeffries & Sons to the rights of the holders of the mortgages which with the proceeds of the Myers mortgage were satisfied. The lien of the Bohn Sash & Door Company for $3,331.67, and that of Edward C. Tighe for $381.97, will be placed in the second class, equal in priority with that of Mahoney & Co., and superior to the rights of Jeffries & Sons. There were two liens in favor of the Bohn Sash & Door Company, recognized in the decree of the district court, of which the first is mentioned above. The second lien was for material furnished between September 17 and November 29, 1890, and was furnished under a contract with Mr. Paul himself, while the first lien was that of a subcontractor. As the second lien was for material the commencement of the furnishing of which was subsequent to the recording of the mortgage now held by Jeffries & Sons, there exists no reason why it should be taken out of the class in which it was placed by the district court.

3. The lien of Henry E. Cox was placed in the tenth class, for the reason found by the district court that the material was furnished and labor done by Mr. Cox after December, 1890. This finding was probably based on the dates given in the claim filed by Mr. Cox for a lien, for therein it was stated that the material and labor required to be furnished and performed were furnished and performed between December 13, 1890, and April 29, 1891. It is true that Mr. Cox in his oral evidence explained that the first date should have been December 13, 1889, instead of 1890, as it was by mistake stated. There is no itemized statement filed with the affidavit in which was contained the above statement of such definiteness as would suggest that there was the alleged mistake in the date on which the furnishing of material and doing of work was begun. The mistake, it may be, cut off a part of the time during which there was the furnishing of material and doing of work, yet we see no way of avoiding the conclusion reached by the district court, for the priority of this lien depends as well upon the filing of a correct claim as upon doing the work and furnishing the material. The lien of Mr. Cox must, therefore, occupy the place assigned it by the district court.

4. The contract of Case & Kennedy was entire for the erection of the buildings on Twenty-sixth street as well as on Twenty-fifth street. Among the subcontractors was George A. Hoagland, who furnished lumber for the buildings in course of erection at both localities. His claim for a lien was filed against both the Twenty-fifth and Twenty-sixth street properties. The comparative size of these erections afforded him a basis on which to base calculations as to the amount of lumber furnished each locality, and these calculations were satisfactory as evidence to the district court. We can see no reason for criticising the method by which the apportionment of liens and application of credits were made in view of the evidence adduced, and

for that reason shall not disturb the results attained. It is insisted, however, that there should have been filed separate claims for liens, in each of which should have appeared a definite description of the property to be affected by such lien, and that a claim for a lien cannot properly be filed *in solido* against distinct properties not contiguous. In *Doolittle v. Plenz*, 16 Neb., 153, this court held that where a contract was made as an entirety for the erection of separate buildings on distinct contiguous lots, that one claim for a lien might embrace all the lots improved. It is difficult to see why the fact that the lots happened to be contiguous should be a controlling consideration, when the ownership of the several lots had, between the making of the improvements and the enforcement of the liens, become vested in different parties. For all practical purposes these lots were then as much separated as though between them intervened streets or blocks. It is the entirety of the contract and not the location of the property which must determine whether a claim or claims shall be filed for a lien or liens. A joint lien upon several buildings, situated upon different lots owned by the same person, could not be maintained where a separate contract had been entered into by the owner and contractor; for by the several contracts the inference would be that a separate account should be kept with each building. Not so when the contract covered several buildings to be erected for a gross sum without regard to the cost of each. It may result to the owner of separate properties to be improved under a joint contract that hardships will be caused incidentally by the fact that a lien may be filed against all the parcels *in solido*, whereby sales of the several lots separately may be prevented. Against this it is easy to guard by avoiding a joint contract, or, if one is used, the contingency mentioned may be guarded against by requiring that the material to be furnished or labor for each building to be erected shall be shown by distinct accounts kept with that purpose in view. In such

cases as that with which we are now dealing it may happen that there shall be a necessity for apportioning the entire lien for the preservation of the rights and remedies of material-men or laborers who have contributed to only one of the erections contemplated in an entire contract.  This consideration, however, concerns rather the ability to make necessary proof than the abstract right to claim a joint lien.  A failure in this respect is a mere failure of proof entitling plaintiff to a judgment; but that result ought not to be so far assumed in advance that other rights given by statute must be denied.  The views above expressed have received approving consideration in *Chadbourn v. Williams,* 71 N. Car., 444; *Sergeant v. Denby,* 87 Va., 206; *Lewis v. Saylors,* 73 Ia., 504; Jones, Liens, sec. 1317, and authorities therein cited.  The finding of the district court was, as to this claim, that the sale and delivery was "between the 23d day of October, 1889, which was the date of the first delivery, and the 25th day of July, 1890, which was the date of the last delivery."  As the first delivery in this account antedated the filing of the mortgage in favor of Willis G. Myers, now held by Jeffries & Sons, it results that its priority should in like manner be fixed.  The amount by the district court found due George A. Hoagland must be established, enforced, and paid as a lien of the second class, equal in priority with the amounts due Mahoney & Co., Bohn Sash & Door Company, and Edward C. Tighe, as hereinbefore set forth, and superior to all rights of Jeffries & Sons.

5. The claim of Charles A. Harvey was for furnishing mantels, hearths, etc., for both the Twenty-fifth and Twenty-sixth street properties.  It appears from the evidence that the articles furnished for the Twenty-fifth street property have been fully paid for, and that the controversy is now as to the date from which the rights of Harvey should be held to have their origin.  There is in the bill of exceptions what appears to have been a proposition for

furnishing mantels, etc., written by Charles A. Harvey to William J. Paul, accepted by Paul. This was marked "Exhibit V," and appears in its proper place. There seems to have been introduced in evidence, as Exhibit U, the affidavit filed for a lien on behalf of Mr. Harvey, but the most diligent search for this exhibit in the bill of exceptions has resulted in a failure to find it. There is a reference in the testimony to Exhibit U attached to Mr. Harvey's cross-bill, but this does not supply the lack of it in the bill of exceptions. Especially is this true when, as in this case, the exhibit referred to as part of the cross-bill can only be found in what appears to be the original pleading filed in the district court, refiled in this court long after the docketing of this appeal.

6. In relation to the Twenty-fifth street property, W. B. Millard, trustee, urges that the claim of James Morton & Son for $298.29 was improperly adjudged entitled to priority over his mortgage. The mortgage to W. B. Millard, trustee, was filed for record March 26, 1890, while the finding of the district court was that the materials for which Morton & Son claim a lien were furnished between March 31, 1890, and September 5, immediately following. It was probably by an oversight that the rights of Millard were postponed to those of Morton & Son. As between these parties, the order of priority declared by the district court will be reversed and the mortgage of Millard established as a prior lien to that of Morton & Son.

The judgment of the district court is modified in the particulars above indicated, and a decree accordingly will be entered in this court.

DECREE ACCORDINGLY.

IRVINE, C., having been of counsel, took no part in the determination of this case.