A. B. Rapp et al., APPELLANTS, v. Emerald F. Rapp et
al., APPELLEES.

108 N. W. 2d 412

Filed April 7, 1961.   No. 34932.

*Beatty, Clarke, Murphy & Morgan, Donald W. Pedersen,* and *Frank E. Piccolo, Jr.,* for appellants.

*Maupin, Dent, Kay & Satterfield,* for appellee Sidney
National Bank.

*Clinton & McNish* and *Heaton & Heaton,* for appellee Deaver.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, and BOSLAUGH, JJ.

SPENCER, J.

This is an action in equity to restrain the foreclosure of a chattel mortgage on a sales pavilion and to subrogate plaintiffs' chattel mortgage for one released by the Sidney National Bank. The trial court denied the relief sought and found defendant Deaver's mortgage to be a first lien on the property in question.

Plaintiffs A. B. Rapp and Freida Rapp, husband and wife, hereinafter referred to as A. B. Rapp, appealed. The defendants are Charles N. Deaver, hereinafter referred to as Deaver; Sidney National Bank, Sidney, Nebraska, hereinafter referred to as bank; and Emerald F. Rapp and Delores E. Rapp, husband and wife, hereinafter referred to as Emerald Rapp. Emerald F. Rapp is the son and Delores E. Rapp the daughter-in-law of the plaintiffs A. B. Rapp.

We determine the material facts to be substantially as detailed hereinafter. On February 20, 1958, Emerald Rapp borrowed $26,694.56 from the bank, secured by a chattel mortgage recorded February 26, 1958. This obligation was renewed on June 24, 1958, and secured by a chattel mortgage recorded August 4, 1958. The loan being in excess of the allowable loan limit of the bank, $12,100.96 thereof was made by participation of the Denver National Bank. A. B. Rapp took no part in the negotiation of this loan, the renewal thereof, nor any subsequent dealings with the bank in any way, and had no interest in any of the property mortgaged as security before October 1, 1958.

On July 28, 1958, Emerald Rapp, without any security or agreement therefor, borrowed $4,000 from A. B. Rapp for the purpose of meeting outstanding checks issued in connection with his sales ring business. On

July 29, 1958, after several attempts over a period of 2 weeks, Emerald Rapp borrowed $20,000 from Deaver for the purpose of financing livestock transactions. This note was secured by a chattel mortgage upon the Sidney Livestock Sales Pavilion, which will hereinafter be referred to as sales barn. This sales barn was included in the bank mortgage. The Deaver mortgage was actually prepared by bank employees. Deaver had called Krieger, the bank president, and asked him to transfer $20,000 from his savings account and give it to Emerald Rapp, and to take a mortgage on the sales barn. Deaver's mortgage was not recorded until October 1, 1958.

During September 1958, A. B. Rapp offered to borrow from the Federal Land Bank and to lend at a lower rate of interest sufficient money to Emerald Rapp to satisfy the Sidney and Denver banks. A. B. Rapp did not know of, and Emerald Rapp did not mention, the indebtedness to Deaver or the fact that he had given Deaver a mortgage. A. B. Rapp, during the last week of August 1958, inquired at the bank concerning the indebtedness of Emerald Rapp. A. B. Rapp was not a customer of the bank, and this was the first and only time he had been in the bank. He talked to Christ, an inactive vice-president, and there is a dispute as to whether he received the correct information about the balance. However, he knew from Emerald Rapp the correct balance before September 27, 1958. He told Christ he was getting a loan to help Emerald pay the money he owed the bank. He also inquired whether Christ knew of any other indebtedness. Christ stated that he did not, and the evidence fails to show that Christ had any knowledge whatever of the debt and note between Emerald Rapp and Deaver, who was a director of the bank. At this time, unknown to Christ, the Deaver mortgage was in the possession of the bank or its president for safekeeping.

At some time before October 1, 1958, Emerald Rapp

promised A. B. Rapp that he would give him a first mortgage upon the sales barn. On October 1, after some indecision and discussion, Emerald Rapp also agreed to give a mortgage on some growing wheat.

The evidence fails to show that there was ever any discussion, offer, or demand that A. B. Rapp should be secured by all of the security previously mortgaged to the bank, but rather the discussions focused upon the sales barn.

On September 24, 1958, Emerald Rapp signed a check in blank on the Potter State Bank, to be completed by the Denver National Bank for the balance due it. When the check was presented for payment on September 27, A. B. Rapp advanced $12,500 to Emerald Rapp to cover it. This check bears the notation, "Loaned on Sale Barn," which A. B. Rapp testified he put on the check after it was paid by the bank and returned to him.

On September 30, 1958, A. B. Rapp made a check of the records through an attorney, and found no other mortgage on record but the two mortgages to the bank. On October 1, 1958, A. B. Rapp gave Emerald Rapp a check for $13,500 to cover the check Emerald Rapp had given to the bank to pay the balance of the bank note. This check bears in the lower left-hand corner the printed word "For" and the typed word "Loan" without further explanation. During the afternoon of October 1, 1958, Emerald Rapp executed a $30,000 note to A. B. Rapp, sufficient to cover the previous loans and advances made to him by A. B. Rapp, together with the mortgage, exhibit 3, covering the sales barn and the wheat. A. B. Rapp personally filed this mortgage for record soon after its execution, but did not check other filings and did not learn that the Deaver mortgage had been recorded a few hours earlier, until sometime in December 1958.

The evidence does not show that Deaver had knowledge or notice of the transactions between the Rapps, or that he failed to record his mortgage earlier for any

fraudulent reason, or that he deceived A. B. Rapp in any way. The only misrepresentation shown by the evidence was made by Emerald Rapp to A. B. Rapp.

The wheat which was included in the A. B. Rapp mortgage had not been included in any of the other mortgages. This wheat was subsequently sold by A. B. Rapp, and $8,041.53 was credited on the mortgage.

The evidence does not show the disposition of the remainder of the security covered by the bank mortgages not included in the A. B. Rapp or Deaver mortgages. This included life insurance policies, farm machinery, 103 head of cattle, grain, miscellaneous equipment, and an agreement for a real estate mortgage on 160 acres of land in Cheyenne County.

A. B. Rapp did not attempt to secure any assignment of the chattel mortgages given to the bank, did not object to the release thereof by the bank, and did not make any claim of a right to subrogation prior to the filing of this action.

Emerald Rapp in 1959 voluntarily surrendered possession of the sales barn to Deaver, who advertised it for sale upon chattel mortgage foreclosure. Sale was not held because of a temporary injunction issued in this action.

The following principles have application herein: " 'Originally, the right of subrogation was limited to transactions between principals and sureties, but courts of equity have expanded the doctrine so that now it will be applied where one, not acting voluntarily, pays the debt for which another is primarily liable, and which, in equity and good conscience, the latter should have discharged. The doctrine will be applied in all cases where demanded by the dictates of equity, good conscience and public policy.' " Equitable Life Assurance Society v. Person, 135 Neb. 800, 284 N. W. 260.

Law writers have generally classified subrogation into two classes: Legal subrogation, which is allowed in cases where one who pays the debt of another stands

in the situation of a surety and is compelled to pay the debt to protect his own rights; and conventional subrogation, which arises when one pays the debt of another under an agreement existing at the time of payment with the debtor or creditor that the person paying it shall be subrogated to the rights of the creditor. Luikart v. Buck, 131 Neb. 866, 270 N. W. 495.

The doctrine or rule of subrogation is not a fixed and inflexible rule of law or equity. It does not owe its origin to statute or custom. It is a creature of the equity courts, invented and applied by them to do justice or prevent an injustice being done in a particular case and under a particular state of facts, where the law is powerless in the premises.

"The mere fact that with the proceeds of a later mortgage a prior one was paid, for the purpose of removing the lien thereof, affords no grounds for subrogating the junior mortgagee to the rights of the former mortgagee upon its being discovered that a lien had arisen intermediate between the two mortgages." Hoagland v. Green, 54 Neb. 164, 74 N. W. 424.

The trial court found as follows: "The plaintiffs acted in good faith but did not make any agreement with the defendant Rapp that they should be substituted for the Sidney National Bank, with its rights and security; that their conduct, in securing a chattel mortgage not including all the security of the Sidney National Bank mortgage, and in taking additional security, to-wit: growing crop, not covered by the bank mortgage, and in failing to demand the right of subrogation promptly after gaining knowledge of the facts is inconsistent with and a waiver of any right of subrogation; that equities between the plaintiffs and the defendant Deaver are at least equal, and that the mortgage to Deaver takes priority by reason of the earlier recording thereof; that the only fraud or misrepresentation shown by the evidence is shown in the statements and conduct of the defendant Rapp; * * *."

A. B. Rapp argues: "Denial of subrogation of A. B. Rapp to the bank's mortgage as against Emerald Rapp who lied to and defrauded A. B. Rapp in getting his father to pay his debt is unthinkable. Deaver has in no manner changed his position to his detriment or been injured in any manner by A. B. Rapp paying the bank's mortgage."

A. B. Rapp further argues that Deaver's position has actually been bettered because of a decrease in the interest rate. The argument sounds logical, but is not accurate. If the bank had foreclosed its mortgages with all additional security, it should be evident that there could not possibly have been as much of a lien against the sales barn as A. B. Rapp now claims to be due. It seems only logical to assume that the bank, if A. B. Rapp had not paid Emerald's obligation, would have foreclosed on all of the property covered by its mortgages. Deaver then would not have had to advance as much money to protect his security as would be required if A. B. Rapp's contention is correct.

A. B. Rapp is not claiming subrogation to all the security covered by the bank mortgages, but only to that portion covering the sales barn, which is the only security Deaver has.

In any event, we said in Rice v. Winters, 45 Neb. 517, 63 N. W. 830: "The fact that a subsequent mortgagee's lien will occupy the same relation to the property, if one who has advanced money, secured by a mortgage on the real estate to pay off the prior mortgage, is subrogated to the rights of the holders of such first mortgage, affords no reason why equity should permit the party so advancing the money to be subrogated to the rights of the holder of the first mortgage."

A. B. Rapp insists that Krieger, the bank president, was Deaver's agent, and that Deaver is chargeable with notice that A. B. Rapp was paying off the bank note. We do not agree that Krieger was doing more than accommodating Deaver in having the papers prepared or

in having the mortgage filed at Deaver's direction. We do not find that any knowledge Krieger may have had is imputable to Deaver. Assuming, however, that Krieger was Deaver's agent, we still do not believe that A. B. Rapp is entitled to the relief sought.

Under the facts in this case, Krieger, even as Deaver's agent, had no obligation to A. B. Rapp to inform him of the Deaver mortgage. At no time did A. B. Rapp ever visit with or communicate with Krieger about the transaction. We further find that A. B. Rapp has not in the slightest degree proved any conspiracy or fraud on the part of the bank and Deaver. Any misrepresentation or fraud in this record is solely that of the son, Emerald Rapp.

In passing, we might observe that there was some testimony, disputed however, from which the trial court could have found that A. B. Rapp knew of an indebtedness on the part of his son to Deaver before the advancement of the $12,500 on September 27, 1958.

This action on appeal is triable de novo. We see no reason to disturb the conclusions of the trial court. This certainly is a case within the ambit of the principle inherent in all subrogation cases and well expressed in Criswell v. McKnight, 120 Neb. 317, 232 N. W. 586, 84 A. L. R. 1361: "* * * the rights of one seeking subrogation must have greater equity than the rights of those opposing it."

A. B. Rapp's chief complaint is the failure of Deaver to file his mortgage until October 1, 1958. While it is not a controlling factor, the evidence is conclusive that the Deaver mortgage was not purposely withheld from record for any improper or fraudulent purpose. The mortgage was payable on demand. Emerald Rapp testified that the mortgage was to be for only a short time; and that he expected to pay Deaver back in 30 days. Deaver testified that Emerald only wanted the money for a week or two. The trial court excluded Deaver's testimony as to demands for payment on A. B. Rapp's

objection. Emerald Rapp's deposition, however, gives the following information: "I mean I talked to Charlie several different times afterwards about it, because I was commencing to wondering myself; the loan wasn't coming through and I knew I had just got it from Charlie for a short time, because he was just helping along to do that. I told him that I thought—I kept checking it all the time; I thought the loan would be coming through. Q. Did he call you on the telephone the first time about payment would you say or not? A. Well, I don't know. He might have called me the first time; I wouldn't say for sure; but I went and talked to him different times about the deal—called him and found out whether he was home. * * * Q. You had a conversation with him shortly prior to October 1, 1958, is that right, at his home? A. Yes, the last time I was there. Q. Do you recall particularly what that conversation was? A. Well, I do know that the last time I talked to him it looked like it was going to be some time before I could pay him and I said things wasn't shaping up the way I thought at that time, and it looked like it would be some time—I couldn't tell him exactly —but as soon as I could I would get the money, I would pay him."

Deaver testified that his last conversation with Emerald about payment was during the late afternoon of September 30, 1958; and that this was the first time that Emerald told him he did not know when he could pay the obligation. He then went to the bank to obtain the mortgage for recording, but it was too late to do so, and Krieger volunteered to have it filed for him the next morning.

We note what A. B. Rapp has to say about oral mortgages, equitable mortgages, and agreements for loans, and do not disagree with the cases cited. However, Deaver had no knowledge of the transactions between A. B. Rapp and his son Emerald Rapp, and the cases cited

are not applicable on the fact situation herein. The other cases cited are also distinguishable on the facts and are not controlling herein.

A. B. Rapp argues: "If Deaver's mortgage was absolutely void on account of not being recorded until after A. B. Rapp obtained his interest in the mortgaged property in controversy in good faith by his equitable or legal mortgage, then the fact that Deaver got his mortgage on ahead of A. B. Rapp's mortgage is wholly immaterial, and does not give to Deaver any superior rights."

The facts are, A. B. Rapp advanced $4,000 of the loan the day before Deaver made his advance, and did so without any thought of security. He advanced $12,500 4 days before his mortgage was executed, and, incidentally, 3 days before his attorney checked the record. He gave Emerald the other $13,500 at the time of the execution of the mortgage, which was at least after the Deaver mortgage was on file.

A. B. Rapp was well aware that his son was in financial difficulties. He was well aware that his son was kiting checks to carry on his business operations. The $4,000 he advanced was to take up such outstanding checks. A. B. Rapp testified that when he told Emerald Rapp in August that he had put in for a loan at the Federal Land Bank to help him: "Well, then Emerald—he said, 'you shouldn't a had done it.' 'Well', I says, 'Emerald, you are still my boy', and I said, 'I am going to help you through hell', I said." While this may not be material, together with the other testimony in the record it does suggest that A. B. Rapp could not have helped but be aware of his son's operations.

While we do not agree with some of Deaver's conclusions, we do believe his analysis of the cases cited by A. B. Rapp on interpretation of the recording statute is sufficient to distinguish this case on the facts.

We conclude that the trial court was correct in the

conclusions drawn from the record, and the judgment of the trial court is therefore affirmed.

AFFIRMED.

SIMMONS, C. J., participating on briefs.