A. B. RAPP ET AL., APPELLANTS, v. EMERALD F. RAPP ET AL., APPELLEES.

112 N. W. 2d 777

Filed January 12, 1962. No. 34932.

*Beatty, Clarke, Murphy & Morgan, Donald W. Pedersen,* and *Frank E. Piccolo, Jr.,* for appellants.

*Clinton & McNish* and *Heaton & Heaton,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

SIMMONS, C. J.

In this action plaintiffs sought subrogation, foreclosure of a chattel mortgage, and equitable relief. Relief was denied. Plaintiffs appeal.

In Rapp v. Rapp, 172 Neb. 68, 108 N. W. 2d 412, we affirmed the judgment of the trial court. We granted reargument. We now set aside our former opinion and judgment, reverse the judgment of the trial court, and remand the cause with directions.

The parties plaintiff are husband and wife. Reference hereinafter need be made only to the husband who will be called the father. The defendants Rapp are husband and wife. He is the son of the plaintiffs and will be referred to herein as the son.

The defendant Sidney National Bank will be referred to as the Sidney bank. It was dismissed from the case during the trial. However, it will be necessary to refer to it during the recital of the evidence.

The defendant, Charles N. Deaver, is a substantial stockholder in and director of the Sidney bank. He will be referred to herein as Deaver. It will be necessary to make reference also to the Potter State Bank of Potter, Nebraska, and the Denver National Bank of Denver, Colorado. They will be described respectively as Potter bank and Denver bank. Mr. Leo Krieger is president of the Sidney bank. He will be referred to herein as Krieger.

Primarily, the controversy here is between the father and Deaver. It requires a determination of the priority

of chattel mortgages given by the son to the father and to Deaver. A question of marshalling of assets is also involved.

Property involved in both mortgages is an auction house with auxiliary equipment including a lunchroom. The auction house and other equipment will be referred to herein as the sale barn. It is located on property leased from the Union Pacific Railroad. The classification of the sale barn as personal property is not questioned.

The father has a common school education. He was a farmer and an auctioneer. He succeeded financially. The son worked with the father, became an auctioneer, farmer, and businessman who appears to have engaged also as a dealer in livestock and other merchandise at his auctions.

The son succeeded in staying within the credit confidence of the Sidney bank and to a lesser degree in the Potter bank although he had a somewhat regular practice of writing insufficient fund checks on each bank.

On February 20, 1958, the son and his wife executed a note to the Sidney bank for $26,694.56, payable in 60 days. This was secured by a chattel mortgage on a large amount of cattle, machinery, grain, and lumber and other equipment. The lumber and equipment of various kinds were clearly to have been and were used in the construction of the sale barn. The Denver bank participated in this loan by arrangements with the Sidney bank. Its only connection with the transaction has to do with such participation financing.

The minutes of the meeting of the board of directors of the Sidney bank, hereinafter called the board, on February 11, 1958, show Deaver present and the "past due notes" of the son read and discussed at that meeting. The son's note and chattel mortgage to the bank, by its terms, became delinquent and unpaid in April 1958.

The minutes of the meeting of the board for May 13,

1958, show Deaver present and show the son's indebtedness to the bank as a matter of discussion.

The minutes of the board for June 10, 1958, again show Deaver present and the son's note a matter of discussion.

On June 24, 1958, the son, in consideration of additional security, was given an extension on his note to July 20, 1958. On that date, the son and his wife executed a note for $26,694.56 payable to the Sidney bank July 20, 1958. This was secured by a chattel mortgage covering largely the general items in the earlier mortgage plus the sale barn and "other buildings and chattels." The Denver bank again participated.

The board minutes for August 7, 1958, show Deaver again present and a discussion had "on all notes past due." The son's note was listed in that category. The board met again on August 12, 1958, with Deaver present. General notes past due were read including that of the son.

The son appears to have continued his inability to meet obligations. On July 28, 1958, the father loaned him $4,000 to meet pressing obligations. This indebtedness was unsecured.

As a result of discussions running over several weeks, on July 29, 1958, Deaver loaned the son $20,000, represented by a promissory note, payable on demand and secured by a chattel mortgage on the sale barn and corrals on the leased premises. This included an agreement to assign the lease to Deaver in the event of a default.

Deaver directed Krieger, by telephone, to transfer the $20,000 to the son by withdrawal from a savings account of Deaver's. Krieger, or other employees at his direction, completed this transaction. So, it appears definitely that Krieger knew that the son was mortgaging the sale barn to Deaver, upon which the Sidney bank had a first mortgage. The mortgage from the son to Deaver was not recorded but left at the Sidney

bank either in the possession of it or where it was available to Krieger and others of its officers and employees.

The board met again on September 9, 1958, with Deaver present. Again, "general loans" past due were read including that of the son.

Both Deaver and the son testify that the loan of $20,000 was to be but for a short time. Deaver gives that as his reason for not recording it. However, it is patent that during this time, efforts were being made by the son and Krieger to refinance the son through a small business loan from the United States. It is, likewise, patent that any recording of the Deaver mortgage would have complicated the effort of the bank to refinance the son's obligations.

Deaver testifies that during September he was increasingly anxious to collect the son's $20,000 loan. The son corroborates that it was a subject of discussion on several occasions.

On September 24 or 25, 1958, the son gave the Sidney bank a check in blank, drawn on the Potter bank. It was sent to and filled in by the Denver bank for the full amount of principal and interest due it and presented to the Potter bank for payment on September 27, 1958. It was an insufficient fund check. The Potter bank attempted to contact the son and failed. It contacted the father. He came to the bank with the son. As a result of a conference had there, the father agreed to loan the son an additional $26,000, the agreement being that the son would give the father a note for $30,000 and give a chattel mortgage as a first lien on the sale barn and some accessories and on a considerable acreage of wheat.

Two checks were made out, payable to the son, at the Potter bank on September 27, 1958. One was for $12,500 which was immediately delivered and together with other funds enabled the son to pay the Denver bank check. It was then paid. Krieger called Potter to

find out if the check, payable to the Denver bank, had been paid and was informed that it had been.

The second check made out at Potter on September 27, 1958, was for $13,500 but dated October 1, 1958. It was payable to the son and deposited to his credit on October 1, 1958, at the Potter bank, to pay off the Sidney bank.

There were intervening events. On September 29, 1958, the son drew a check on the Potter bank, payable to the Sidney bank for the full amount of its note and interest remaining unpaid. Assuming the payment of the check, the son's obligation to the Sidney bank was then paid.

Deaver testified that just about that time the son told him that he would not be able to pay the $20,000 obligation in the near future. Deaver then, professing complete ignorance of the fact that the Sidney bank was being paid, decided to record his mortgage. On the late afternoon of September 30, 1958, Deaver directed Krieger at the Sidney bank to have his mortgage recorded. It was too late to have it done that day. It was done, by Krieger's direction, some time on the morning of October 1, 1958. Some time during the morning of October 1, 1958, Krieger telephoned the Potter bank and was told that the check to it for the balance of the son's indebtedness had been paid. Krieger told the Potter bank he wanted to know "in order that he could release the mortgage." We have not been able to tell by direct evidence which of these two events preceded the other.

The Sidney bank released of record its February 20, 1958, mortgage on December 15, 1958, and its June 24, 1958, mortgage on January 5, 1959.

In the meantime, on September 30, 1958, the son and father went to a lawyer in Sidney and directed the drafting of a note for $30,000 and the drafting of a chattel mortgage to secure its payment.

The drafting of this chattel mortgage was completed

either on September 30 or October 1, 1958. It provided that the property being mortgaged was free and clear of all encumbrances. It covered the sale barn, auxiliary buildings and equipment, and several hundred acres of wheat and grain that had not previously been covered by the chattel mortgages mentioned herein. The son told his father there were no mortgages ahead of the one he was giving his father.

At the father's insistence, the lawyer checked the chattel mortgage records later in the afternoon of September 30, 1958. He obviously found the Sidney bank mortgages which had been paid off. He found no other mortgages. The father and son appeared at the lawyer's office on the morning of October 1, 1958. The note and mortgage were signed by the son and the $13,500 check delivered and immediately taken to Potter and deposited. The son's wife did not sign the note and mortgage until some time after the noon hour. The father then immediately took the mortgage to the courthouse and had it recorded.

It cannot be questioned on this record but that the father contracted to receive a first lien on the property mortgaged. No one denies it. Deaver claims no knowledge of it. Everyone, including Krieger (but excluding Deaver, so he says), knew that the father was advancing the $26,000 to the son for the specific purpose of paying the Sidney bank indebtedness, including that of the Denver bank. No one denies that it was so used.

Deaver testified that he did not know for several days when his mortgage had been recorded. The board's meeting of October 16, 1958 (with Deaver present), does not show the son's note among the listed delinquent notes.

Deaver's urge, which possessed him in September, to secure payment of the $20,000 disappeared. Everyone connected with the transaction maintained silence. The father did not find out about the Deaver mortgage and its recording ahead of the one to him until some time

in December 1958. When that knowledge was disclosed, the father went to the lawyer and inquiry began into the transaction and this litigation followed.

There was a conference in Sidney in December 1958, evidently initiated by Krieger, in an effort, apparently, to persuade the others that the son was not insolvent, to persuade the father to accept a second lien status, and to thereby permit the Deaver mortgage to retain priority. Deaver attended that meeting. According to his testimony, he was little more than an interested onlooker.

Although there is no direct evidence that Deaver knew of the father's mortgage or knew when the bank had been paid off, all the circumstances point to such knowledge and to the fact that he waited his time to protect the Sidney bank and to get his mortgage on record after the bank had been paid. Certainly Krieger was Deaver's agent in this matter and had full knowledge of all that transpired including the source of the money that the son paid the Sidney bank and the obligation for security that went with it.

It is to be remembered that Deaver is a businessman. It is difficult to believe that he is as naive as this record indicates. Simple caution and elementary knowledge of the recording acts and their purpose would have caused Deaver to have recorded his mortgage—but he did not until he thought he was in a position to make a man who had trusted his son bear the loss.

It is recognized that there are many decisions of many courts, some of which would sustain the denial of subrogation here, others would not.

Appellate courts, including ours, have a habit at times of going from decision to decision and failing to return at times to the refreshing reasoning of original rules and decisions.

It seems to us that courts, including our own, have placed the emphasis in subrogation cases upon facts rather than weighing facts to determine whether or not

justice and equity require subrogation.

It is said repeatedly that because certain facts exist subrogation is justified. From that it has been held that certain facts or combination of facts must exist to permit subrogation. Such is not the rule. It makes for rigidity. It erects compartments into which cases must fit fact-wise. It ignores the resiliency in the rule. Its very purpose was to permit an equity court to do justice under the facts and not to erect barriers.

The equity courts have been building up a restriction on their own powers reminiscent of the action of the common law courts which result in the development of equity as a separate jurisdiction both of adjective and substantive law.

We have repeatedly stated the rule that: " 'The doctrine of subrogation is not administered by courts of equity as a legal right, but the principle is applied to subserve the ends of justice and to do equity in the particular case under consideration. It does not rest on contract, and no general rule can be laid down which will afford a test in all cases for its application. Whether the doctrine is applicable to any particular case depends upon the peculiar facts and circumstances of such case.' " Equitable Life Assurance Society v. Person, 135 Neb. 800, 284 N. W. 260.

We early stated the rule that: " 'The real question in all such cases is whether the payment made by the stranger was a loan to the debtor through a desire to aid him or whether it was made with the expectation of being substituted in place of a creditor.' " Bohn Sash & Door Co. v. Case, 42 Neb. 281, 60 N. W. 576. This rule has been repeatedly approved down to and including Hoagland & Co. v. Decker, 118 Neb. 194, 224 N. W. 14.

Subrogation may be had where certain facts exist, or do not exist, which justify an equity court doing justice in the premises. However, presence or absence of comparable certain facts in other cases does not neces-

sarily become a criterion which requires granting or denial of subrogation. The essential element is that facts exist which require subrogation that justice be done.

We conclude that justice and equity here require that the father have a first lien on all that property covered by the mortgage to him of October 1, 1958, for the full amount secured thereby. Deaver should have a second lien on all that property included in his mortgage which is also included in the father's mortgage.

There is another rule of equity that requires this result: "The general rule is that where one of two innocent persons must suffer by the acts of a third, he whose conduct, act, or omission enabled such third person to occasion the loss must sustain it if the other party acted in good faith, without knowledge of the facts, and altered his position to his detriment." Terry Bros. & Meves v. National Auto Ins. Co., 160 Neb. 110, 69 N. W. 2d 361. Deaver's conduct successfully enabled the son to deceive his father to his loss and detriment.

We said earlier herein that there was a question of marshalling of assets involved. The father had a mortgage on wheat as a part of his security for the $30,000 note. He realized something in the neighborhood of $8,000 on the wheat. The net amount received by the father should be applied to the reduction of the $30,000 debt and interest. It is our understanding that was substantially done in the trial court. There are other items of personal property included in the father's mortgage which are not included in the Deaver mortgage. They, likewise, should be sold and the net amount applied to the reduction of the $30,000 debt and interest. All property remaining unsold included in the bank's mortgage to which the father is subrogated, and not included in Deaver's mortgage, should be sold and applied to a reduction of the indebtedness from the son to the father before resort may be had to the property covered by Deaver's mortgage. All property received by the father

from the son, whether or not it is included in any mortgage, except where received in payment of some other valid existing indebtedness should also be credited on the $30,000 note. Equity will not permit the father to receive money or property from the son in the nature of a gift to the detriment of Deaver. If there be more than enough received to pay the $30,000 note and interest after thus marshalling the assets and the sale of the sale barn, any surplus remaining shall be paid to the defendant Deaver, after payment of the costs. All costs in this court and the trial court are taxed to the defendant Deaver.

A deficiency judgment or judgments are authorized to be entered against the son, if the sales do not produce a sufficient amount to pay either the father or Deaver, or both.

A result of this decision is that we are not required to determine the father's contention with reference to the effect of the recording acts.

Our prior opinion and judgment in Rapp v. Rapp, *supra,* is set aside. The judgment of the district court is reversed and the cause remanded for further proceedings in accord with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.
SPENCER, J., dissents.