AUSTIN JORDAN, APPELLEE, V. DUANE BUTLER, APPELLANT,
IMPLEADED WITH JACK L. BUTLER ET AL., APPELLEES,
IMPLEADED WITH NEBRASKA SECURITIES COMPANY, A
CORPORATION, APPELLANT.

156 N. W. 2d 778

Filed February 23, 1968. No. 36623.

McGinley, Lane, Mueller & Shanahan, for appellant Duane Butler.

W. H. Kirwin and Neal D. Youmans, Jr., for appellant Nebraska Securities Co.

Wright, Simmons & Hancock, for appellee Jordan.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

CARTER, J.

This is an action in equity by a seller of cattle against a purchaser who accepted delivery but refused to pay for same, and subsequent purchasers who had purchased and accepted delivery of the cattle from the initial buyer. The trial court decreed that plaintiff had the title and right of possession of the cattle and that he had a lien and is entitled to the proceeds of the sale of the cattle; and that Nebraska Securities Company has judgment against Duane Butler, the possessor of the cattle at the time of trial, for the principal sum of $17,000 plus interest and that it has a first lien on the proceeds resulting from the sale of the cattle found that were covered by its security agreement in the amount of $166.49. Duane Butler and Nebraska Securities Company have appealed to this court. For convenience, we shall refer to the

plaintiff, Austin Jordan, as Jordan; to Duane Butler, a defendant, as Duane; to Jack L. Butler, a defendant, as Jack; to the Nebraska Securities Company, a corporation, a defendant, as Securities Company; to the J. L. Butler Construction Company, Inc., a defendant, as Construction Company; and Ronald Licht, a defendant, as Licht.

Jordan is a livestock dealer and truckline operator in Montgomery, Alabama. He had been acquainted with Jack and the Construction Company, both of which were located at Fremont, Nebraska. His acquaintance with Jack and the Construction Company had existed since 1959, during which period he had sold cattle to Jack or the Construction Company, Jack being the owner and sole stockholder of the Construction Company. In 8 or 10 previous cattle dealings, Jordan had sold and delivered cattle to Jack or the Construction Company, drawing drafts on the purchaser for the cattle and trucking charges which had been promptly paid on all previous occasions. Sometime between March 18 and March 20, 1966, Jack called Jordan by telephone and contracted to purchase 400 heifers to weigh approximately 400 pounds each. The number was subsequently reduced to 300 by agreement. Jordan agreed to sell at $24 per cwt. for the heifers, was to receive an additional 25 cents per cwt. as his commission, and was to receive an additional $1.50 per cwt. for trucking charges to Fremont or Omaha and $1.75 per cwt. if trucked to Gering. Before shipping any of the cattle, Jordan received instructions from Jack to deliver the cattle to Duane at Gering. On March 23, 1966, Jordan shipped 100 head to Gering and delivered them to Duane's feedlot. Jack was present when this first truckload was delivered although they were receipted for by Duane's wife. Jack subsequently called Jordan and informed him not to ship any more cattle because of their poor quality. Jordan told him that a second load of 100 was enroute. The second load was shipped on March 26, 1966, and delivered on March 28, 1966. They likewise were delivered to Duane's feedlot

and receipted for by Duane. Jack had left Gering before the arrival of the second load. Jordan did not ship more than 200 head which Duane received. On March 26, 1966, Jordan drew a sight draft on the Construction Company for the first load of cattle in the amount of $10,583.06 for the cost of the cattle, his commission, and the trucking charges. On the same day, he drew a similar sight draft in the amount of $10,484.87 for the second 100 head. Jordan was informed by wire on April 5, 1966, that the sight drafts were dishonored and on April 13, 1966, he received the formal notices of the nonpayment of the drafts. On April 8, 1966, Jordan came to Gering, saw the cattle in Duane's feedlot, and on April 12, 1966, filed the present action claiming title to the cattle.

The evidence shows that on or about March 18, 1966, Duane came to the Securities Company and informed Harvey L. Sams, Jr., an officer of the company, that he was expecting to purchase 250 head of southern heifers and wanted to know if a loan could be had to help meet the purchase price. He was informed that the Securities Company would go to the extent of $17,000 on 250 head. On March 28, 1966, Duane informed Sams the cattle were delivered and Sams went to Duane's feedlot and inspected the cattle which he found to be in order. Duane came in and presented a bill of sale for 250 head of cattle signed by Licht. Licht testified that he was an employee of the Construction Company and Jack, that he had no interest in the transaction, that he merely followed the directions of his employer, and that his only interest in the transaction was as the representative of Jack and the Construction Company. Pursuant to Jack's instructions, Jack being in New York on a business trip, Licht went to Gering and delivered to Duane a bill of sale for 250 head of cattle, 50 more than the 200 delivered by Jordan. Duane testified that he subsequently paid amounts of $17,000, its origin being the loan from the Securities Company, a sum of $3,000 in cash, and a further sum of $3,250, by the check of a business asso-

ciate, the total of which, in the sum of $23,250, constituted full payment for the cattle. All of the $23,250 was alleged to have been delivered to Jack by Licht which Jack does not deny. Sams, the agent of the Securities Company, testified that he saw the cattle several times during the next 3 or 4 months in Duane's feedlots near Gering.

Duane testified that the cattle in his feedlots at the time of trial were the, same cattle purchased through Licht on which the Securities Company had its $17,000 security agreement. On April 12, 1966, Jordan, Sams, Duane, and two others inspected the cattle and counted 228 head. Duane said some of them had died and that others of the 250 head had not been found after all had escaped from the feedlots. Licht testified that 50 head of cattle were purchased to complete the 250 head transferred to Duane by the contract and bill of sale, some of which were bought locally and some in Denver, Colorado, from the Greeley Sales Barn. These 50 head were delivered to Duane at Gering by truck on March 27, 1966.

The evidence will not sustain a finding that the 250 head of cattle subject to the lien of the Securities Company were in Duane's feedlots after October 31, 1966. Glenn Blalock, the sole owner of the Blalock Livestock Company of Greeley, Colorado, testified that he looked at 230 southern heifers, weighing about 600 pounds each, at Duane's feedlot south of Gering in September 1966. He purchased 215 head on or about September 24, 1966, for $23.50 per cwt., plus 30 cents per cwt. for trucking. They were delivered to Blalock in late September and early October 1966. These cattle were delivered to one Domke, a cattle feeder near Loveland, Colorado. The cost of these cattle was $32,398. Duane purchased 198 head of 400-pound southern heifers from Blalock who purchased them from Quinn Brothers, in Jackson, Mississippi, and caused them to be delivered to Duane at Gering at a cost of $21,098.26. The difference was $11,299.74 which was paid to Duane by Blalock by check

on October 8, 1966. It is clear that the 215 head of cattle were removed and sold by Duane without the consent of the Securities Company and in violation of a restraining order issued by the district court for Scotts Bluff County on April 12, 1966, and were replaced with 198 400-pound southern heifers purchased from Quinn Brothers in Jackson, Mississippi. Of the 215 head sold by Duane to Blalock, 70 head were transported from Gering to Goshen County, Wyoming, by Blalock's trucker and unloaded at a ranch in that county. Duane obtained a Goshen County clearance and ordered the cattle reloaded and transported on into Colorado to the point of destination. The additional 145 head do not appear to have been inspected, which Blalock was unable to account for. The proof is conclusive that the 215 head covered by the Securities Company lien were sold to Blalock by Duane and delivered to buyers in Colorado pursuant to Blalock's instructions.

The foregoing summarizes the facts as disclosed at the final hearing of the case commencing on February 8, 1967.

Defendant Duane Butler asserts error by the trial court in denying him a continuance. Duane's application for a continuance alleged his inability to attend the trial because of his illness which was supported by the affidavit of his physician to the effect that it would be harmful to the health and well-being of Duane to participate in the trial of the case. We accept these facts as showing the physical inability of Duane to attend the trial.

A party to a civil action ordinarily has a right to be present at the trial, but his inability to be present does not necessarily warrant a continuance of the trial. The trial judge has a very wide measure of discretion when ruling on an application for a continuance. The grant of a continuance, with or without a written application, will not ordinarily be reviewed in the absence of a showing that it materially injured the adverse party. A grant

of a continuance because of the illness of a defendant is not necessarily required. In such a case, such application must contain a showing that defendant is a material witness with a recitation of the material facts to which he would testify, if present. Ofttimes such stated facts can be admitted as true or a stipulation made that the absent witness would so testify, if present, and a continuance be thereby avoided. Waldron v. Lapidus, 121 Neb. 54, 236 N. W. 139; Good v. Bonacum, 78 Neb. 792, 111 N. W. 796. But in the instant case, the record shows that the absent defendant had appeared and testified at a previous portion of the trial. It also shows that his deposition had been taken which was on file and used in the final stage of the trial. Nothing is pointed out that indicates that defendant was prejudiced by the denial of the continuance. We fail to see how the defendant was prejudiced, particularly in a trial to the court, by the use of his deposition in his absence. The court did not abuse its discretion in denying a continuance.

Jordan contends that title never passed to Jack and that he is still the owner of the cattle. He relies on section 2-401, U. C. C., which states in part: "(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, * * * (b) if the contract requires delivery at destination, title passes on tender there. * * * (4) A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a 'sale'." The title to the cattle passed to Jack on delivery of the cattle to Duane as provided in subsection (2) (b) of the above-quoted section of the statute. There was no revesting of title in Jordan under subsection (4) of the above-quoted section of the statute for the reason there was no rejection or other refusal by the buyer to

receive or retain the goods, or a justified revocation of acceptance. The quoted section does not provide for a revesting of title for nonpayment of the purchase price alone, unless the contract of sale so provides. It is true that Jordan demanded and was refused possession of the cattle by Duane on April 9, 1966. But this is after Duane's voidable title had vested and the rights of the Securities Company as a good faith purchaser for value to the extent of its lien had attached.

The evidence shows that Jack accepted and retained the possession of the cattle after their delivery to him at Gering. On March 25, 1966, he entered into a contract of sale of the cattle and delivered a bill of sale to Duane through Licht as his agent. In fact, he received the sale price before he dishonored the sight drafts drawn on him by Jordan. Under these circumstances his actions have all the appearances of a fraudulent transaction subjecting him to the penalties of the criminal law and the statutory provisions of the Uniform Commercial Code, section 2-403. That provision states in part: "A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though * * * (b) the delivery was in exchange for a check which is later dishonored, or (c) it was agreed that the transaction was to be a 'cash sale', or (d) the delivery was procured through fraud punishable as larcenous under the criminal law." Under these provisions, Jack conveyed at least a voidable title to Duane.

On the strength of Jack's contract to sell and his bill of sale of the cattle, handled through his employee Licht, the Securities Company loaned Duane $17,000 and took a lien on the cattle for this amount. The Securities Company had no notice of any defect in the title to the cattle. Its security agreement was filed for public record on March 30, 1966. It had the cattle inspected in Duane's feedlots in Scotts Bluff County. It clearly

qualified as a good faith purchaser for value from a purported owner holding a voidable title. § 2-403, U. C. C. The validity of the Securities Company lien on the 200 head of cattle obtained from Jordan and the additional 50 head purchased in Denver is beyond question.

It is the contention of Jordan that Duane is not a bona fide purchaser for value in that he is a party to the fraud perpetrated on Jordan. Duane, on the other hand, contends that he is a bona fide purchaser for value for the cattle Jack purchased from Jordan and that he had no notice or knowledge of any fraud on the part of Jack. It will be noted at the outset that Jack and Duane Butler are brothers. The record shows that Duane visited with Sams about his desire for a loan to buy 250 head of 400-pound southern heifers on March 18, 1966. On the same day that Duane expressed this desire to Sams, Jack called Jordan and purchased the cattle as heretofore stated and directed them to be delivered to Duane at Gering, Nebraska. The cost of the cattle, commission, and transportation charges was $21,067.93. Before Jordan's sight drafts for this amount were dishonored by Jack, Jack had sold the cattle to Duane for $23,250, indicating a profit of $2,182.07. After this transaction was allegedly completed, Jack notified Jordan that he was dishonoring the sight drafts because of the poor quality of the cattle. The good faith of the refusal of Jack to pay is questionable in view of the fact that he had sold and received payment for the cattle and put himself beyond his power to rescind the contract. It would appear that the objection to the quality of the cattle was not made in good faith and is evidence that Jack never did intend to pay Jordan for the cattle.

There is other evidence which supports the foregoing conclusion. Duane and Licht both testify and Jack admits that Jack received the $17,000 which originated from the loan made by the Securities Company to Duane. The $17,000 check given by Duane to Licht was cashed at a North Bend bank for some unknown reason. It is

a peculiar circumstance that the North Bend bank did not send the check through regular banking channels. Instead, Mr. Wolf of that bank came to Scottsbluff to get cash for the $17,000 check. The necessity for a speedy cashing of this check can only be surmised by an inference that Jack desired to have the check cashed before he refused to pay Jordan. Duane testifies that he paid $3,000 of the balance due to Jack on March 29, 1966. He says he paid it in cash to Licht downtown in Cheyenne, Wyoming. He first said he paid the balance of $6,250 in cash and later stated that Robert Nedbalek of Loveland, Colorado, made the payment of $3,250 for him. He was interrogated as to the source of these funds. His answer was he kept the money in a personal place he did not care to disclose; that he just "had it." Jack testified that if Licht testified he received the $3,000 he got it, "but I don't think he did." Jack denies receiving the $3,250, which Licht says he gave him, after once admitting its receipt. We think the evidence of these alleged cash payments is incredible and affords a method of establishing their stories without being verified by checks and bank deposit slips. Jack was unable to show with any certainty that he ever received the $3,000 in cash. He comes up with the story that he returned the $3,000 in cash to Nedbalek because he owed him money. Here again there was no check or deposit slip to verify his statement, although he produces a receipt for the amount signed by Nedbalek whom Duane describes as a business associate. There is a check in the record signed by Nedbalek in favor of Jack for $11,000, bearing the date of March 17, 1966, which Jack testifies was never paid. Yet Jack testifies that he gave the $3,000 in cash to Nedbalek for money that he owed him for 100 head of cattle. The testimony that the $3,000 was given to Nedbalek for cattle does not appear consistent under the circumstances. The stories of paying out items of $3,000 and $3,250 in cash at casual meetings on the street and the differences in the testi-

mony of Jack, Duane, and Licht lead us to the conclusion that the two cash payments were never made and that the testimony to the contrary was false.

Duane testifies that the 198 cattle on hand at the time of trial were the cattle delivered to him by Jordan the previous March. This evidence is conclusively established as wholly false. The cattle delivered by Jordan were sold to Blalock and delivered in Colorado as instructed by Blalock. Duane bought the 198 head of 400-pound heifers and substituted them for the cattle bought from Jordan. It is evident that Duane substituted the light cattle for the heavier cattle in order that he could convert the difference in value into cash to the extent of $11,299.74, which he did. The substituted cattle were purchased to satisfy the lien of the Security Company which appeared necessary to avoid criminal prosecution for selling and moving the Jordan cattle without the consent of the lienor. His fear that Jordan's institution of suit might have resulted in the taking of his whole interest in the cattle for payment of his liabilities seems to have motivated the unlawful sale of the Jordan cattle in violation of the district court injunction. It is evident also that Duane did not feel that his claim that he was a good faith purchaser for value was free of his own doubt to the extent that he could safely rely on it.

After a consideration of all the facts and circumstances, including the testimony proven to be false and that which is so incredible as to be beyond belief, we can come to no other conclusion than that the transaction reeks with fraud. It is true that the direct evidence of fraud is fragmentary, but this is generally true in fraud cases of this kind. When the evidence, fragmentary as it is, is considered with the inferences reasonably to be drawn from the actions of the parties, it fits together like the pieces of a jig-saw puzzle. It was clarly the intention of Jack and Duane Butler that Jack would buy the cattle, turn them over to Duane through Licht for the amount

that they could be mortgaged, and then refuse to pay for the cattle. Jack got $17,000 in cash and Duane got cattle of the value of $23,250 for the amount of the lien at Jordan's expense. The actions and conduct of the parties speak so loud that it is most difficult to hear their excuses and claims of good faith.

The record shows that Duane stipulated that the cattle in his possession at time of trial were to be sold and the net proceeds thereof paid into court. The sale was had and the returns of the sale paid into court in the amount of $19,982.02 on November 8, 1966. The trial court found that the Securities Company had a lien on the proceeds for $166.49, the sale price of two cows identified as being within the Securities Company lien. The Securities Company asserts this is error.

The $19,982.02 was paid into court in lieu of the cattle in Duane's possession. These cattle, other than the two cows previously mentioned, are not cattle that were sold by Jordan, nor are they cattle on which the Securities Company took a security agreement. The fund standing in place of the cattle stands in the nature of a constructive trust to be distributed in accordance with the priorities of the parties. The Securities Company as a good faith purchaser for value without notice of any title defect is entitled to have its $17,000 lien, with interest, paid first from the fund. Any amount remaining should be allowed on the judgment procured by Jordan. Jordan has no lien on the cattle for the reason that the conditions for the revesting of title do not exist under the Uniform Commercial Code as we have heretofore explained. It must be pointed out that it is a rule of long standing that where one of two innocent persons must suffer by the acts of a third, the one whose conduct, act, or omission enables such third person to occasion the loss must sustain it if the other party acted in good faith without knowledge of the facts and altered his position to his detriment. Terry Bros. & Meves v. National Auto Ins. Co., 160 Neb. 110, 69 N. W. 2d 361. It was Jordan who

delivered the cattle without collecting the purchase price that made it possible for Jack and Duane Butler to perpetrate the fraud on the Securities Company as a good faith purchaser for value without notice.

We hold that the Securities Company has a first lien on the $19,982.02 fund in the hands of the court to the extent of its lien and the balance, if any, should be applied on the judgment of Jordan. We hold also that Jordan is entitled to judgment against Jack and Duane Butler for the amount of the sale price of the cattle sold to Jack, together with interest and costs. We hold further that the Securities Company is entitled to judgment against Duane Butler for the amount of its security agreement which is to operate as a lien on the fund in the hands of the court. The costs of this appeal are taxed to Jack and Duane Butler.

REVERSED AND REMANDED.

BOSLAUGH, SMITH, and McCOWN, JJ., dissenting in part.

Concurring with the result in respect to the interest of Securities, we dissent otherwise. Two problems are: (1) Denial of continuance, and (2) the appellate holding "that Jordan is entitled to judgment against * * * Duane * * * for the * * * price of the cattle sold to Jack." The record is significant.

Jordan's pleadings do not state that Duane committed fraud. Jordan freely admits that Securities in good faith gave value. His theory is this: The law permits the immediate transferee of the original purchaser, but not a subsequent transferee, to qualify as a good faith purchaser for value. Licht of course did not qualify. The theory, we think, eventually affected trial rulings.

At the trial one continuance was ordered because of Duane's hospitalization. No reason was given for denial of his motion for a second continuance. The court found the bills of sale void, but it made no other finding relevant to good faith purchase for value. Securities as well as Duane was denied relief. Yet not a shred of evidence hinted that Securities failed to qualify. The trial court

surely adopted Jordan's theory. Licht's status being conceded, the court probably concluded that Duane would not be a material witness.

Duane may be unable to overcome the strong evidence against him, but his complaint about denial of continuance should not be brushed aside. His position is supported not only by circumstances but by precedent also. See, Horr v. Easton, 114 Neb. 829, 211 N. W. 172; Juckniess v. Howard, 120 Neb. 213, 231 N. W. 843; Annotation, 68 A. L. R. 2d 470. No affidavit was necessary to show that he was a material witness. Furthermore an ample substitute for the affidavit is the majority opinion itself.

The district court found that Jordan had a first lien on the proceeds of sale. It rendered judgment accordingly. Jordan has not cross-appealed. There is neither pleading nor argument that Duane should be held personally liable for the contract price in the Jordan-Jack transaction. No such issue was decided by the district court. It should not be decided now.