419 F.2d 13
 The RATH PACKING COMPANY, Appellee,
v.
PAUL BLOOD FARMS, INC.; Paul Blood; Gering National Bank, a Corporation; Robert L. Kelley and Francis Kelley, Appellants,
The First National Bank of Morrill, Nebraska, a Corporation, and The Omaha National Bank, a Corporation.
The RATH PACKING COMPANY, Appellee,
v.
PAUL BLOOD FARMS, INC.; Paul Blood; Gering National Bank, a Corporation, Appellants,
Robert L. Kelley; Francis Kelley; The First National Bank of Morrill, Nebraska, a Corporation, and The Omaha National Bank, a Corporation.
The RATH PACKING COMPANY, Appellant,
v.
PAUL BLOOD FARMS, INC.; Paul Blood; Gering National Bank, a Corporation, Appellees,
Robert L. Kelley; Francis Kelley; The First National Bank of Morrill, Nebraska, a Corporation.
 No. 19491.
 No. 19492.
 No. 19493.
 United States Court of Appeals Eighth Circuit.
 December 12, 1969.
 
 COPYRIGHT MATERIAL OMITTED Floyd E. Wright, of Wright, Simmons & Hancock, Scottsbluff, Neb., for Rath Packing Company; Morris Y. Kinne, Jr., Waterloo, Iowa, was on the brief.
 Lester A. Danielson, Scottsbluff, Neb., on the brief for Gering National Bank.
 William E. Morrow, Jr., of Swarr, May, Royce, Smith, Andersen & Ross, Omaha, Neb., on the brief for Robert L. Kelley and Francis Kelley.
 Before MATTHES, GIBSON and BRIGHT, Circuit Judges.
 BRIGHT, Circuit Judge.
 
 
 1
 Paul Blood, who operated a lamb feed lot near Morrill, Nebraska, in 1964 wrongfully sold several thousand lambs owned by others who had placed those animals in his care for feeding. On June 5, 1964, insufficient lambs remained in his feed lot to satisfy the ownership or lien claims of the parties to this appeal.
 
 
 2
 Rath Packing Company (Rath) of Waterloo, Iowa, brought this diversity action against Robert L. Kelley and Francis Kelley (Kelley) and Gering National Bank (Bank) of Gering, Nebraska, and others[1] asserting its ownership over most of the remaining animals.[2] Additionally, Rath claimed the proceeds from Blood's sale of approximately five hundred lambs on June 3. The lamb purchaser deposited these disputed proceeds in the Registry of the Court. Separately, Rath asserted beneficial ownership of, and sought to hold the Bank accountable as a constructive trustee for, funds derived from the sale of Rath's lambs which Blood had deposited and disbursed from his bank account.
 
 
 3
 In a court case, the district court adjudged:
 
 
 4
 (1) That of the 6,345 lambs which remained on Blood's feed lot as of June 5, Rath owned 4,425; Kelley owned 453; and the Bank possessed a valid lien on 1,467;
 
 
 5
 (2) That on June 3, Blood had sold five hundred Rath lambs and Rath was entitled to the proceeds thereof;
 
 
 6
 (3) That Rath was entitled to take judgment against the Bank as a trustee for $35,036.67.
 
 
 7
 Kelley and the Bank appealed. Rath cross-appealed. We affirm the judgment of the district court in its entirety.
 
 
 8
 We necessarily examine the relationship between Blood and Rath, Blood and Kelley, and Blood and the Bank. Operating as both a lamb feeder and as a lamb order buyer, Blood purchased 8,973 lambs for approximately $179,000.00 on Rath's orders during 1964. Blood consummated these purchases in his own name. Immediately after each transaction, he obtained reimbursement of the purchase price by drawing a sight draft on Rath in an amount sufficient to pay the cost of lambs listed on invoices sealed in an attached envelope. Rath honored each draft.
 
 
 9
 In accordance with a verbal agreement, Blood retained possession of the lambs for feeding purposes. He furnished Rath with a monthly inventory of Rath's animals on the lot and he billed Rath biweekly for feed consumed by Rath's lambs. Rath also paid other maintenance expenses including the cost of lamb shearing. The agreement provided that as the lambs fattened and became ready for market, Blood would ship them to Rath's Waterloo plant for slaughtering. If they were not needed for that purpose, Blood, with Rath's specific authorization, could sell them on the local market for the best possible price. The parties agreed to divide any profits derived from the sale of animals or their wool. Rath agreed to assume any loss.[3]
 
 
 10
 The parties had engaged in similar business transactions for twenty years.
 
 
 11
 Rath's lamb buyer instructed Blood not to disclose these lamb feeding arrangements. The buyer testified that packers customarily attempt to avoid disclosing the number of their lambs on feed in any area, particularly to competitors.
 
 
 12
 Conceding that Blood had earlier converted 4,034 of its lambs, Rath claimed to trace its ownership to 4,832 lambs in the feed lot on June 5.[4]
 
 
 13
 In the early months of 1964, prior to June 5, Blood also fed 5,021 lambs belonging to Kelley, 4,140 of which Blood purchased on Kelley's order and at Kelley's expense. Kelley agreed to share any profits with Blood. He authorized Blood to market these lambs only with his consent. During these months, Blood sold a substantial number of Kelley's lambs for which he rendered an account to Kelley. From February to June, Kelley checked his lambs on the Blood feed lot every two weeks. On these occasions, Blood pointed to lambs in the yard and recited, "These are your lambs." Since Blood maintained more lambs in the feed lot than Kelley owned, he "supposed" that the additional lambs belonged to Blood.
 
 
 14
 As of June 5, Kelley claimed that Blood owed him an accounting for 2,067 lambs, including approximately five hundred lambs Blood sold Wilson Packing Company on June 3. The trial court, from Blood's records, traced Kelley's ownership to 453 lambs on the feed lot and, as we have already noted, determined that Wilson Packing Company had purchased Rath's and not Kelley's lambs.
 
 
 15
 Notwithstanding these findings, Kelley charges that Rath's direction to Blood to conceal Rath's ownership of lambs implicitly authorized Blood to misrepresent the ownership of lambs in his possession. Therefore, argues Kelley, Rath should be estopped from claiming any lambs in preference to Kelley.
 
 
 16
 The Bank also assumed that Blood owned sufficient lambs to secure his loans. As of June 5, Blood owed the Bank $73,498.24 principal on four notes. These notes were secured by chattel mortgages describing 5,843 specific lambs as well as all livestock owned by Blood. Blood obtained loans by representing to the Bank that he had recently purchased, or was about to purchase, lambs for feeding purposes. Though the Bank failed to verify its "security" when it made the loans, the Bank president did inspect lambs on Blood's lot every thirty days. On these occasions, Blood pointed to the lambs in various pens and professed, "These lambs belong to you and these belong to Mr. Kelley." The Bank could not otherwise identify the animals. The number of lambs listed in each new mortgage could not be correlated with a similar number of lambs purchased by Blood at or near the date of the chattel mortgage transaction.
 
 
 17
 The Bank, like Kelley, claims that Rath's direction to Blood to conceal Rath's ownership of lambs in Blood's possession prevented it from discovering that Blood had mortgaged lambs he did not own. Thus, the Bank insists that Rath be estopped from asserting ownership in lambs or proceeds derived from their sale, in preference to the Bank's claim to the animals under its chattel mortgages.
 
 
 18
 Blood applied proceeds derived from marketing lambs and from drafts drawn on Rath to finance commodity market speculations primarily in frozen pork belly futures. Though the Bank and Kelley were aware of Blood's commodity market activities, the trial court specifically found "* * * that Rath, Kelley, and the Gering Bank were each at all times acting in good faith, with no fraud on the part of any of them."
 
 
 19
 In Scottsbluff Nat. Bank v. Blue J Feeds, 156 Neb. 65, 54 N.W.2d 392 (1952), the Nebraska Supreme Court had occasion to review and reiterate the requirements necessary to establish an estoppel. These rules are:
 
 
 20
 "To constitute an equitable estoppel, there must exist a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted upon; and the party to whom it was made must have relied on or acted upon it to his prejudice.
 
 
 21
 * * * * * *
 
 
 22
 To sustain an estoppel because of the omission to speak, there must be both the specific opportunity and the apparent duty to speak. The party maintaining silence must have known that some one was relying thereon, and was either acting, or about to act, as he would not have done had the truth been told. (Citations omitted.)
 
 
 23
 In order to constitute an equitable estoppel by silence or acquiescence, it must be made to appear that the facts upon which it is sought to make the estoppel operate were known to the parties against whom the estoppel is urged." 156 Neb. at 79-82, 54 N.W. 2d at 401-402.
 
 
 24
 In this case, Rath engaged in no transactions directly or through intermediaries with either Kelley or the Bank. Rath made no direct representations to either. Rath's instruction to Blood not to publicize its ownership neither invited nor directed Blood to falsely advise the Bank or Kelley; nor did it encourage Blood to sell Kelley's lambs and convert the proceeds. Rath erred only in entrusting Blood with sheep, as did Kelley. The Bank believed Blood's statements of acquisition of new lambs to support his loan applications. Both Kelley and the Bank relied on Blood's false identity of lamb ownership. The trial court specifically found:
 
 
 25
 "The evidence discloses no circumstances whereby Rath had a duty to disclose its ownership. Prior to defendants' taking possession of the lambs, Rath had no knowledge of defendants' interest and no knowledge that anyone was acting in reliance on the belief that Blood owned the lambs.
 
 
 26
 Blood made all the representations upon which the bank and Kelley relied. Rath made no representations, false or otherwise to the bank. In fact, Rath did not know of the representations until it learned of the bank's taking possession of the lambs." By application of the rules of estoppel as set out in Scottsbluff Nat. Bank v. Blue J Feeds, supra, to these unchallenged findings, we agree with the trial court that no estoppel bars Rath from claiming its lambs. See Jordan v. Butler, 182 Neb. 626, 156 N.W.2d 778 (1968); Snyder v. Lincoln, 150 Neb. 581, 35 N.W.2d 483 (1948); First Nat. Bank of Bridgeport v. First Nat. Bank of Hartington, 111 Neb. 441, 196 N.W. 691 (1923).
 
 
 27
 Both the Bank and Kelley assert, however, that they should prevail over Rath under equitable principles as enunciated by the Nebraska courts that "[w]henever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it." Oleson v. Albers, 130 Neb. 823, 828-829, 266 N.W. 632, 635, 105 A.L.R. 714 (1936). See also Bauer v. Bauer, 136 Neb. 329, 285 N.W. 565 (1939). Under this doctrine, a variation of estoppel, the person seeking to recover need not show that he relied on the conduct of a party sought to be charged. It is sufficient if the latter's action produced a series of events which culminated in the loss. The Bank says that the fact that Rath clothed Blood with possession of its lambs and the fact that Rath directed Blood to conceal its ownership enabled Blood to successfully pose as the owner of Rath's lambs to the Bank's detriment. Kelley similarly asserts that Rath's delivery of lambs to Blood made possible Blood's deception of him and for that reason Rath should bear the loss.
 
 
 28
 The principle of Nebraka law upon which Kelley and the Bank rely was first applied in Roy v. McPherson, 11 Neb. 197, 7 N.W. 873 (1881). In that case, the Nebraska Supreme Court held that an owner of real property, who permitted title to be taken in another's name, could not enjoin the other's judgment creditors from levying on the land. The court applied the wholesome maxim of the law "* * * that a party who enables another to commit a fraud is answerable for the consequences." 11 Neb. at 200, 7 N.W. at 874.
 
 
 29
 In 1896, the Nebraska Supreme Court applied a similar doctrine in barring a mortgagor from claiming that his payment to an agent of one who had previously held the mortgage note was not binding against the present note holders saying, "Where one of two innocent persons must suffer through the misfeasance of the agent of one, that one must suffer who has placed the agent in a position to perpetrate the fraud complained of." Bull v. Mitchell, 47 Neb. 647, 654, 66 N.W. 632, 634 (1896).
 
 
 30
 Such doctrine has applied to a negligent claimant to personal property. First Nat. Bank of Omaha v. Provident Finance Co., 176 Neb. 45, 125 N.W.2d 78 (1963), assignee of conditional sales contract delayed in recording document; Rapp v. Rapp, 173 Neb. 136, 112 N.W.2d 777 (1962), chattel mortgagee failed to timely file instrument; Greeley County v. First Nat. Bank of Cozad, 126 Neb. 872, 254 N.W. 502 (1934), creditor's assignee failed to notify debtor.
 
 
 31
 The principle can also apply to prevent a non-negligent person from recovering. Thus, in Oleson v. Albers, 130 Neb. 823, 266 N.W. 632, 105 A.L.R. 714 (1936), a farmer who entrusted a trucker with produce could not recover the purchase price from a purchaser who had already paid the trucker for the produce. The court observed:
 
 
 32
 "* * * [W]hile it is unfortunate that the plaintiff was deceived in the confidence that he placed in the trucker, yet the law has many times been laid down: `Whenever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it.' Broom's Legal Maxims (9th Ed.) 463." 130 Neb. at 828-829, 266 N.W. at 635.
 
 
 33
 In the more recent case of Jordan v. Butler, 182 Neb. 626, 156 N.W.2d 778 (1968), decided under provisions of the Uniform Commercial Code enacted subsequent to the events in the instant case, a non-negligent seller of livestock was prevented from asserting ownership against a financing agency who obtained a mortgage on the cattle from an intermediate possessor holding a defeasible title to the animals. The court recited:
 
 
 34
 "It must be pointed out that it is a rule of long standing that where one of two innocent persons must suffer by the acts of a third, the one whose conduct, act, or omission enables such third person to occasion the loss must sustain it if the other party acted in good faith without knowledge of the facts and altered his position to his detriment. Terry Bros. & Meves v. National Auto Ins. Co., 160 Neb. 110, 69 N.W.2d 361. It was Jordan [seller] who delivered the cattle without collecting the purchase price and made it possible for Jack and Duane Butler [buyers] to perpetrate the fraud on the Securities Company [chattel mortgagee] as a good faith purchaser for value without notice." 182 Neb. at 637-638, 156 N.W.2d at 785.
 
 
 35
 See also, Sullivan Co. v. Wells, 89 F.Supp. 317 (D.C.Neb.1950). Compare Snyder v. Lincoln, 150 Neb. 581, 35 N.W.2d 483 (1948).
 
 
 36
 In each of these cases, the owner transferred his property to the possession of a second party, who in turn sold or hypothecated the same property to an innocent third party. Kelley cannot show that he purchased Rath's lambs from Blood. The Bank cannot show that Blood pledged it Rath's lambs. Kelley and the Bank seek to apply equitable principles bearing on estoppel as a means of transferring ownership of animals from Rath to them rather than to protect their interests in specific lambs. Such application is contrary to the usual use of estoppel in pais as a shield, not a sword. See McNamara v. Miller, 106 U.S.App.D.C. 64, 269 F.2d 511, 514 (1959).
 
 
 37
 Further, only specious reasoning suggests that Rath's conduct, act or omission, any more than Kelley's or the Bank's, occasioned the losses sustained by all the parties. None of the parties marked their animals in any way for identification purposes. With this omission, Blood easily deceived appellants. In our view of the undisputed evidence, we cannot say as a matter of law that Rath bears greater responsibility than the Bank or Kelley for losses attributable to Blood's fraud.
 
 
 38
 The judgment, as entered by the trial court, requires the bank, in the posture of a trustee, to repay Rath $35,036.67, representing proceeds from Blood's sales of Rath's lambs which Blood paid to the Bank for application to the indebtedness secured by chattel mortgages on lambs. Like its claims relating to the animals which remained on the feed lot, the Bank asserts that an estoppel bars Rath from showing that Blood applied the proceeds from the sale of Rath's lambs, rather than proceeds from the sale of mortgaged lambs, to the chattel mortgage indebtedness. Our determination that Rath is not estopped from asserting its ownership of its lambs disposes of this issue.
 
 
 39
 Rath, on the cross-appeal, asserts that the trial court erred in denying it recovery against the Bank as a constructive trustee of Rath's funds for the following additional items:
 
 
 40
 (a) $21,434.74, representing moneys over and above the $35,036.67 which was awarded to Rath, traceable to proceeds of the sale of Rath's lambs which the Bank applied in payment of Blood's chattel mortgages;
 
 
 41
 (b) $40,393.36, representing other proceeds traceable to Blood's sale of Rath's lambs, including wool sheared from those animals, deposited in Blood's checking account and disbursed by him to finance his commodity speculations with various brokers and the Kelley Investment Company, a business owned and operated by appellant Kelley.
 
 
 42
 As to item (a) above, the Nebraska rule provides:
 
 
 43
 "Where property, as here, has been acquired by fraud, equity, at the suit of injured parties, will impress a constructive trust upon such property in their favor and, in the event of a prior transfer by the wrongdoer, will trace the property, if possible, through whatever mutations and impress a trust thereon in the hands of a third person, unless he be a bona fide purchaser for value and without notice." Meier v. Geldis, 148 Neb. 561, 565, 28 N.W.2d 140, 142 (1947).
 
 
 44
 See Meier v. Meyer, 153 Neb. 222, 43 N.W.2d 502 (1950); Meier v. Trosper, 152 Neb. 184, 40 N.W.2d 811 (1950); Meier v. Geldis, 148 Neb. 304, 27 N.W.2d 215 (1947); Allen Dudley & Co. v. First Nat. Bank of Omaha, 122 Neb. 443, 240 N.W. 522 (1932); Cady v. South Omaha Nat. Bank, 46 Neb. 756, 65 N.W. 906 (1896). However, a creditor who advances his debtor further money or credit in reliance on his receipt of payment applied to an antecedent debt or otherwise changes his position to his detriment relying on such payment holds the funds free of such trust. See Meier v. Meyer, supra; Meier v. Trosper, supra; Meier v. Geldis, supra; Allen Dudley & Co. v. First Nat. Bank of Omaha, supra; Cady v. South Omaha Nat. Bank, supra.
 
 
 45
 With regard to cross-appellant's claim (b) above, Rath's brief asserts that to recover it must establish that the Bank acquired notice that the funds deposited in Blood's account were trust funds and further that Blood's purchase of commodities with those funds constituted a breach of trust.
 
 
 46
 The trial court found, as to claim (a) above, that the Bank extended further credit to Blood on the strength of Blood's payment on account of his antecedent debts and that the Bank sustained an additional loss of at least $21,434.74 by reason of that extension of further credit. As to item (b) above, the trial court found that the Bank had no knowledge that Blood's deposits were impressed with a trust nor that the checks drawn to brokers and Kelley Investment Company constituted misapplication of trust funds. It further found that the proceeds from the sale of wool from Rath's lambs were not traceable to the Bank account, but, even if they were, such proceeds had not been held by Blood as a trustee.
 
 
 47
 We have reviewed the record. Ample evidence supports these findings. The trial court did not misapply the law to these findings.
 
 
 48
 We affirm the trial court on all appeals.
 
 
 
 Notes:
 
 
 [1]
 Rath joined Paul Blood and Paul Blood Farms, Inc., who were treated as one entity for the purpose of this litigation, as defendants and charged them with converting lambs and their wool. Rath also joined First National Bank of Morrill and Omaha National Bank of Omaha as chattel mortgagees of Kelley's lambs
 
 
 [2]
 Kelley and the Bank removed the remaining lambs to another feed lot on June 5. In early stages of the dispute, the parties stipulated that the Bank might market the lambs and hold the proceeds at interest in lieu of the lambs
 
 
 [3]
 On a group of Texas lambs which Blood purchased for Rath in May, Blood guaranteed that there would be no loss. Blood told Rath that he would make this special concession because he needed money immediately to purchase a farm
 
 
 [4]
 The trial court determined that Blood's feed lot records, though substantially accurate, contained some errors. From Blood's feed lot records and his accounts recording purchases and sales of lambs, the trial court traced Kelley's ownership to 453 lambs remaining in the feed lot and made its finding to that effect. The trial court also found that 1,467 lambs which Blood purchased in mid-May had neither been transferred nor sold to others but remained on the feed lot subject to the Bank's general lien. The trial court allocated the balance of the lambs, 4,425, to Rath, somewhat less than 4,832 allocable to Rath on the feed lot records which designated Rath's lambs as Northern #1 and Northern #2
 
 
 
 49
 GIBSON, Circuit Judge (dissenting).
 
 
 50
 I respectfully dissent. While Rath, Kelley and the Bank were all found to be innocent parties, which finding is supported by the record, it was the affirmative action of concealment by Rath that enabled Blood to carry out his fraudulent conversion. Kelley and the Bank did everything reasonably possible to check on Blood's operation and to give third parties notice of their interest in the lambs that were in the possession of Blood. Kelley checked on his lambs at frequent intervals and had also mortgaged them. The chattel mortgage was of record, constituting constructive notice to the public (including Rath) of Kelley's and the mortgagee's interest. The Bank likewise filed its chattel mortgage, which again constituted constructive notice to all of the Bank's interest.
 
 
 51
 Kelley, in making a personal check on his lambs, was shown a sufficient number of lambs asserted by Blood to belong to Kelley and there remained a large number of other lambs that presumably belonged to Blood and were mortgaged to the Bank. If Rath had taken similar precautions of checking on its lambs and not concealing its interest, Blood's fraudulent aspirations would have been much more difficult and would most likely have been uncovered sooner.
 
 
 52
 The effect of affirming the District Court's decision gives judicial sanction to secret agreements covering concealed ownership of personal property. This places the wrongdoer or converter into a position to cause harm to innocent persons and serves to protect secret, silent or unknown principals. A false facade is thus set up to trap both the wary and the unwary.
 
 
 53
 I feel it is improper to clothe a person with all the indicia of ownership, including possession, of marketable personal property without taking reasonable precautionary steps to warn the public and those dealing with the possessor that the possessor does not hold clear legal title to the property. The principle of open and full disclosure in commercial transactions is deeply rooted in our jurisprudence. Filing and recording requirements give notice and prevent secret agreements and undisclosed ownerships from operating to the detriment of the public, while actual concealment of title or lien interests enforceable against innocent third parties gives impetus to and enables the fraudulent converter to carry out his criminal activities.
 
 
 54
 I think, therefore, that this is a classic case calling for application of the equitable principle that, "Whenever one of two innocent parties must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it." Oleson v. Albers, 130 Neb. 823, 266 N.W. 632 (1936). This principle has long been recognized in Nebraska, commencing with Roy v. McPherson, 11 Neb. 197, 7 N.W. 873 (1881), and followed by Bauer v. Bauer, 136 Neb. 329, 285 N.W. 565 (1939), and Jordan v. Butler, 182 Neb. 626, 156 N.W. 2d 778 (1968). Rath in placing the lambs in Blood's possession and actively and intentionally concealing its ownership made possible Blood's conversions and a continued perpetration of Blood's fraud on Kelley and the Bank.
 
 
 55
 To my mind the least that should be done in resolution of the rights and liabilities of the innocent parties would be to treat the lambs as fungible property and thus have the innocent parties bear their proportionate share of the loss. I can attach no greater integrity to Blood's records than I would to his stewardship of other peoples' property.
 
 
 56
 I would reverse and remand.