**In re WILD LILLY, INC., Debtor.**

**Bankruptcy No. 85 B 10398.**

United States Bankruptcy Court,
S.D. New York.

Aug. 16, 1985.

Salon, Marrow, Dyckman & Trager, by Jacques Catafago, Michael H. DuBoff, New York City, for New Point Fabrics, Inc.

Otterbourg, Steindler, Houston & Rosen, by Howard Saffan, New York City, for trustee.

### DECISION ON MOTION BY NEW POINT FABRICS TO DIRECT DEBTOR TO RETURN PROPERTY

TINA L. BROZMAN, Bankruptcy Judge.

On March 25, 1985 a chapter 7 petition was filed on behalf of Wild Lilly, Inc. ("Wild Lilly") which thereafter consented to an order for relief entered April 26, 1985. A trustee was duly appointed on May 21, 1985.

■ On April 24, 1985, New Point Fabrics, Inc. ("New Point") filed a motion to recover goods from Wild Lilly, pursuant to 11 U.S.C. § 725.[1] Thereafter, on May 28, 1985, an evidentiary hearing was held before this court. Essentially, New Point seeks to declare that certain fabric it sold to Wild Lilly was held by Wild Lilly as bailee for New Point and to recover from the trustee the proceeds from the sale of this fabric.[2] The trustee contests the claimed bailment and argues that inasmuch as New Point and Wild Lilly had a contract for sale of fabric under which Wild Lilly may potentially be liable, New Point would merely be an unsecured creditor and not a bailor. For the reasons set forth below, this court finds there was no bailment between New Point and Wild Lilly and, accordingly, denies New Point's motion to recover the proceeds from the sale of the fabric.

### FACTS

On June 4, 1984, Wild Lilly ordered 22,000 yards of custom-made fabric from New Point at a price of $3.25 per yard. Between August and September, 1984, New Point delivered approximately 24,000 yards of the ordered fabric.[3] Subsequent to this shipment and sometime in October of 1984, a conversation took place between Allan Gitlin, President of New Point, and Claude Elbaz, a principal of Wild Lilly, in which Elbaz informed Gitlin that New Point overshipped by 2,000 yards and that Wild Lilly also did not need an additional 3,000 yards all of which yardage Wild Lilly wanted to return. New Point immediately took back the excess 2,000 yards it overshipped. The testimony with respect to the agreement for the remaining 3,000 yards is conflicting.

Gitlin testified that New Point agreed to take back the 3,000 yards if and when a buyer was found for it and to charge Wild Lilly the difference between the contract price and the price obtained from the third party. He further stated that he so agreed in an effort to help Wild Lilly because he viewed it as an attractive new account. After New Point took back the initial 2,000 yards Wild Lilly deducted from its payment the entire 5,000 yards. Gitlin contends that

---

1. Inasmuch as New Point is seeking a turnover of goods or a declaratory judgment as to the title of goods, New Point should have commenced an adversary proceeding in accordance with Part VII of the Bankruptcy Rules. *See* Federal Rules of Bankruptcy Procedure 7001. Insofar as there was no objection by Wild Lilly and since both parties were prepared to proffer testimony at the scheduled hearing, this court permitted New Point to proceed by motion.

2. The court previously authorized the sale of the fabric with the proceeds to be held in escrow pending resolution of this motion.

3. Paragraph 6(f) of the contract comports with the custom in the industry and states that "where goods are specifically made or printed for Buyer ... delivery or tender of 10% more or less shall be deemed full performance." Thus, the excess 2,000 yards were not improperly delivered to Wild Lilly; however, since New Point took back 2,000 yards (*See* facts *infra*), that amount is not at issue.

this was not commensurate with their agreement. Gitlin testified that Elbaz said he would pay the difference when he sold the fabric. Again, Gitlin contends that this was at variance with the earlier agreement. Although Wild Lilly was ultimately successful in selling approximately 1,000 yards, it did not turn over those proceeds to New Point. As the matter could not be resolved, New Point began arbitration proceedings against Wild Lilly seeking not the goods but payment for the 5,000 yards of fabric which Gitlin contends Wild Lilly renegged on entirely. Those arbitration proceedings were never consummated due to the intervening chapter 7 petition.

Michael Greenberg, secretary-treasurer and shareholder of Wild Lilly, who had no personal knowledge of the conversations between Gitlin and Elbaz, testified that he was told the 2,000 yards would be sent back immediately to New Point and that both Wild Lilly and New Point were going to try to sell the remaining 3,000 yards. He further testified there was no demand for return of the goods by New Point, only demands for payment.

DISCUSSION

█ Counsel for both parties are in accord that the transaction began as a sale of custom-made fabric and did not create a bailment relationship. However, New Point argues that Wild Lilly rejected but retained the goods, thereby becoming a bailee of the fabric with title remaining in the seller. The parties have failed to file briefs supporting their respective positions, however, it would appear that counsel for New Point is relying upon section 2–401(4) of the Uniform Commercial Code for support of his bailment theory. That section states:

> A rejection or other refusal by the buyer to receive or return the goods, whether or not justified, or a justified revocation of acceptance revest title to the goods in the seller. Such a revesting occurs by operation of law and is not a "sale."

N.Y. Uniform Commercial Code § 2–401(4) (McKinney 1984) (referred to as N.Y.U.C. C.). Accepting Gitlin's characterization of his conversation with Elbaz, which Wild Lilly has failed to refute, this court finds that New Point has nonetheless failed to prove that Wild Lilly either rejected, refused to retain, or justifiably revoked acceptance of the fabric, any one of which circumstances, if met, would revest title in New Point.

The facts do not reveal a rejection by Wild Lilly but instead indicate it accepted the fabric and either attempted to revoke that acceptance or simply breached by failing to tender full payment. Pursuant to section 2–602 of the N.Y.U.C.C., rejection of goods is ineffective unless the buyer seasonably notifies the seller. Failure to make an effective rejection after a reasonable opportunity to inspect results in acceptance of those goods. NYUCC § 2–606(1)(b). Wild Lilly retained the goods for approximately one to two months before it informed New Point that it was not desirous of keeping the entire shipment. Further, no affirmative steps were taken during this interim period to indicate rejection such as in *Ryerson v. Commodity Engineering, Inc.,* 689 F.2d 478 (4th Cir.1982). There, the court found title to defective equipment revested in the seller where the buyer seasonably notified the seller that the equipment was not being accepted after attempts to remedy the defect were unsuccessful, failed to tender any payment *and* on several occasions sought to have the defective equipment removed from the premises. Here, Wild Lilly not only failed to seasonably notify New Point that it was rejecting the goods, but kept the payment for the goods which were sold. Moreover, New Point's actions were not consistent with rejection; it gave no instructions to Wild Lilly about disposition of the fabric but merely agreed to help find a buyer to alleviate Wild Lilly's problem.

Wild Lilly's deduction of the price for the 5,000 yards also is insufficient to warrant revesting of title to New Point. *See Jordon v. Butler,* 182 Neb. 626, 156 N.W.2d 778, 783 (1968) (interpreting U.C.C. § 2–401(4) and finding that absent a contract provision, the nonpayment of the purchase price alone without a rejection or other refusal by the buyer to receive or retain

the goods, or a justified revocation of acceptance does not warrant title to be revested in seller.)

Nor did Wild Lilly refuse to "retain the goods." It is clear it accepted and maintained the fabric at its premises with the hope the fabric would be sold. No evidence was adduced suggesting that any efforts were made to remove the fabric from Wild Lilly's premises.

■ Lastly, Wild Lilly did not justifiably revoke acceptance of the fabric.[4] The question of whether revocation is justified is a factual one. *Tennessee-Virginia Construction Company v. Willingham*, 117 Ga.App. 290, 160 S.E.2d 444, 447 (1968). There seems to be no dispute that Wild Lilly got what it bargained for, but later determined that it did not need all the fabric.[5] That determination would not render an attempted revocation of acceptance justifiable as would, for example, late delivery or delivery of damaged or nonconforming goods. No evidence was offered which would support this court in holding that Wild Lilly had justifiably revoked its acceptance.

■ Consequently, New Point has not established a predicate for a finding that title to the goods revested in it under N.Y. U.C.C. § 2–401(4). Moreover, New Point's argument that it viewed its agreement with Wild Lilly as creating a bailment is inconsistent with its commencement of arbitration proceedings seeking to recover not the remaining 3,000 yards of goods but the contract price for the whole 5,000 yards, including the 2,000 yards which it took back. While not condoning Wild Lilly's actions, this court finds that no bailment existed. The proceeds from the sale of the fabric should accordingly inure to the estate for the benefit of its creditors. Thus the motion is denied.

---

**4.** This is not to suggest that Wild Lilly did, in fact, revoke its acceptance. Resolution of the question as to whether it effectively revoked its acceptance is unnecessary because any revocation would have had to have been justifiable for title to have revested in the seller and, here, if

there was a revocation it was not a justifiable one.

**5.** Since Wild Lilly only received 2000 yards more than it had ordered, the overage was in keeping with the contract between the parties. See footnote 3, *supra*.