(71 N. W. Rep. 135.)

---

NEW ENGLAND MORTGAGE SECURITY CO. *vs.* GREAT WESTERN ELEVATOR CO.

Opinion filed April 23rd, 1897.

**Estoppel—Motion for Directed Verdict.**

> Where, in a jury trial, counsel on both sides request the court to direct a verdict, and a verdict is directed, counsel thereby consent to a withdrawal of the case from the jury, and consequently are estopped from predicating error upon such withdrawal.

**Consent to Sale of Mortgaged Property—Waiver of Lien.**

> Where the mortgagee authorized the mortgagor to sell the property described in the mortgage at private sale, and, with the proceeds, pay the debt secured by the mortgage, and the sale was accordingly made by the mortgagor, but he failed to pay the debt, *held* that, by authorizing such sale, the mortgagee waived the lien of the mortgage, and could not thereafter recover the property, nor its value, from the purchaser.

**Directed Verdict—Error.**

> Upon the facts stated, the trial court directed a verdict in favor of the mortgagee against such purchaser, at private sale. *Held,* that such ruling was error.

Appeal from District Court, Barnes County; *Rose,* J.

Action by the New England Mortgage Security Company against the Great Western Elevator Company. Judgment for plaintiff, and defendant appeals.

Reversed.

*P. H. Rourke,* and *Winterer & Winterer,* for appellant.

*Young & Burke,* for respondent.

WALLIN, J. This is an action brought by the owner of a chattel mortgage upon a crop of wheat against an elevator company, for the value of such wheat. The action was tried to a jury, and, at the close of the case, the defendant, by its counsel, requested the trial court to direct the jury to find for the defendant. This request was refused, and, at the request of plaintiff's counsel, the trial court directed a verdict for plaintiff. These rulings are assigned as error in this court. Both sides, having requested a directed verdict, are in the attitude of consenting to the withdrawal of all questions of fact from the jury, and are also in the attitude of claiming that there are no disputed questions of fact in the case. In such cases, where, as in this case, there is no conflict in the evidence, the question is whether the court erred in its conclusion of law in directing a verdict. In other words, did the court, in directing a verdict, put a proper legal construction upon undisputed facts?

For the purpose of this decision, we shall concede certain facts to be established by the evidence, which defendant's counsel insists are not established. We shall assume that the undisputed evidence shows that plaintiff's chattel mortgage was duly filed, and covered certain wheat, which was raised and owned by the mortgagor; that, after such wheat was threshed, the mortgagor sold and delivered the same to the defendant; and that the debt is still unpaid. We further assume that the defendant converted the wheat to his own use, and refused, on proper demand therefor, either to pay the debt secured by the mortgage, or to deliver the wheat to plaintiff. Nevertheless, it is our opinion, and we shall so rule, that the plaintiff has, through its authorized agent, debarred itself from asserting or claiming a lien on the wheat. The evidence shows clearly that the agent knew of and authorized the sale of wheat to the defendant. The attorney for the plaintiff, who represented plaintiff in procuring the note and mortgage, and has at all times since their execution and delivery to him had the same in his hands, testified in plaintiffs behalf as follows: "I have had the note in my possession from the time of

its execution until now. I have authority to do anything with it that they have." Upon the trial, one Thurber, a witness for the plaintiff, testified as to a conversation had at Valley City, between the mortgagor (Vold) and the plaintiff's said agent, as follows: "I was at Valley City with him once, the day he paid the $10 on the note. I was with him at Mr. Young's office when he paid the money. Q. Anything said that day between Mr. Young and him about the wheat? A. Well, he told Mr. Young that he was taking the grain to Oriska, because he could get better prices than at Valley City. Q. Can you state any clearer just what Mr. Young said to Mr. Vold about the hauling and selling of the wheat, and to pay him? Get it in just as near the language of Mr. Young as you can. A. I can't give it any clearer. I didn't pay any attention to the conversation. It was not interesting to me. Q. What were they talking about when Mr. Young wanted him to hurry and haul off the wheat? (Question read.) A. In that conversation Mr. Young stated to Mr. Vold to hurry up, and haul in the grain that he raised. Q. What did Mr. Young want him to hurry for? A. I don't know. Q. What did Young say? A. I don't remember exactly. He told Ole, he says, 'I would hurry up, and haul the grain;' and Ole says, 'I can't until Thurber hauls it for me, because he is doing the work.' Q. What did he tell him to do with it when it was hauled? A. To pay him. Q. What did he say? What did he want him to do, if anything? A. Well, just hurry and haul off the grain. That is about all I know. Q. Was there anything said about paying the rent on the land? A. Well, not as I remember of anything about pay or rent. Q. Was there anything said about the note or chattel mortgage? A. Not as I remember of. Q. You don't remember what led up to the conversation? A. No, sir; I don't remember. Q. But they were talking about the wheat that was grown on section six? A. Yes, sir. Q. You were hauling it, and had hauled one load to the N. P. elevator, and had sold it? A. Yes, sir. Q. Of which this $10 was paid on the note, that day as part — A. I couldn't say as particularly of that load. Q. Who col-

lected the money? A. Ole Vold. Q. You knew that Ole Vold talked that over at Mr. Young's office? A. Yes, sir. Q. Did they talk about this load of wheat? A. No, sir. Q. They were talking about wheat that was to be sold? A. Yes, sir. Q. Mr. Vold said he was hauling it there, because he was getting a better price at Oriska than he could get at Valley City? A. Yes, sir. Q. That is the fact? A. Yes, sir. Q. And Mr. Young said he wanted him to hurry up, and get it hauled? A. Yes, sir." On his redirect examination, the witness stated to Mr. Young, the agent who tried the case for plaintiff: "I do remember of him talking to you, but don't pay such terrible strong attention, but I hear him talking to you. I can recollect what he said that day. He told you he was hauling off the grain."

The evidence we have quoted is not disputed, and to our minds it is significant that the agent Young, who tried the case for the plaintiff, and who testified as a witness in plaintiff's behalf upon other features of the case, does not attempt to deny the evidence we are here discussing. In his brief in this court, appellant's counsel says: "There is absolutely no evidence that respondent's agent, Young, even if he had the power, which is not shown, authorized the sale of the grain, or authorized the mortgagor to receive the price therefor. A suggestion by a collection agent to haul grain (and deliver storage tickets) cannot be warped into an authority to sell and convert the proceeds." The trouble with this proposition of counsel is that the statements of fact contained therein are not only without support in the record, but they are clearly refuted by the record. As has been seen from the testimony,—and the fact otherwise clearly appears from the record,—the agent of plaintiff had plenary authority from his principal. He was authorized to pursue his own course, and adopt any lawful means to collect the claim which the plaintiff might adopt. He therefore might, if his judgment dictated that policy, direct the debtor to sell the mortgaged property, and with the proceeds discharge the debt. This, we think, is what the agent did do in effect. There is not a suggestion in the evidence

that the agent directed the debtor to haul the grain to the elevator, and there store the same; nor a suggestion that storage tickets be obtained by the debtor, and brought to the agent. The evidence educed will bear no such construction. On the contrary, it shows unmistakably that, after one load of the grain had been sold at Valley City, the debtor went into the office of the agent, and paid an installment on the note, and, while there, he informed the agent that the rest of the grain which was then not hauled from the debtor's premises would be taken to Oriska, because better prices could be had there than could be obtained at Valley City. This can mean nothing else than an announcement by the debtor of a purpose to sell the residue of the grain, and was wholly inconsistent with a purpose to store the grain. Moreover, the witness was asked, the pointed question, "What did he tell him to do with it when it was hauled?" and he answered, "To pay him." This testimony shows a plain direction by the agent to sell the grain, and out of the proceeds to pay the plaintiff's claim in the agent's hands. The other parts of the testimony are precisely to the same effect. After being told that the mortgagor contemplated taking the grain to Oriska to procure a better price, the agent responded, "Hurry up and haul the grain." This can mean nothing less than full consent to the proposed sale of the wheat by the debtor, and, as we have said, there was not a suggestion in the interview looking like an instruction to the mortgagor to store the grain or to bring a storage ticket to the agent. It is therefore clear that the agent made his election, and permitted the mortgagor to sell the property covered by the mortgage at private sale. The agent was in a position to have asserted his rights under the mortgage; but, instead of pursuing that course, the plaintiff's agent saw fit to make the mortgagor his agent, by directing him to sell the property at private sale, where the best price could be had, and out of the proceeds of the private sale to pay the claim of the plaintiff. This course was wholly inconsistent with any subsequent assertion of the lien of the mortgage. After the sale at private sale

was made, pursuant to plaintiff's directions, the mortgage lien no longer existed. It was extinguished by the sale as effectually as it would have been by a payment of the debt. The sale at Oriska, having been made with the full consent of the mortgagee, through its agent, became the act of the mortgagee; and, in its legal aspect, the sale has the same operation as it would have had if made by the plaintiff through any other agent, or by the plaintiff itself. The fact that the agent who made the sale failed to apply the proceeds to the extinguishment of the debt is plaintiff's misfortune, but it cannot alter the legal effect of the sale transaction. That there is a waiver of the lien of the mortgage as a result of the mortgagee's consent to the sale is entirely elementary. See Jones, Chat. Mortg. (3rd Ed.) § 465.

The record is silent as to whether, before the sale of the grain was made, the defendant was informed that the plaintiff had consented to such sale. But this is immaterial. If, as a matter of fact, the sale had been consented to in advance, such consent could · be pleaded as a defense to any action predicated upon the lien of the mortgage. The lien had been waived by the mortgagor's consent, followed by the sale pursuant to the consent. It follows that the trial court erred in directing a verdict for the plaintiff.

For such error, the verdict and judgment are vacated, and a new trial ordered. All the judges concurring.