**SWIFT AND COMPANY, a Corporation, Appellant,**

**v.**

**JAMESTOWN NATIONAL BANK, a Corporation, and Alvin Hornbacher, Doing Business as Jamestown Livestock Sales, Appellees.**

**SWIFT AND COMPANY, a Corporation, Appellee,**

**v.**

**JAMESTOWN NATIONAL BANK, a Corporation, and Alvin Hornbacher, Doing Business as Jamestown Livestock Sales, Appellants.**

**Nos. 19643, 19644.**

United States Court of Appeals, Eighth Circuit.

May 21, 1970.

Armond G. Erickson, of Tenneson, Serkland, Lundberg & Erickson, Fargo, N.D., on brief for Swift and Co.

John Hjellum, of Hjellum, Weiss, Nerison, Jukkala & Vinje, Jamestown, N.D., on brief for Jamestown National Bank, and others.

Before BLACKMUN, MEHAFFY and LAY, Circuit Judges.

LAY, Circuit Judge.

Swift and Company (hereinafter Swift) appeals from a judgment entered upon a jury verdict in favor of Jamestown National Bank, a corporation (hereinafter Bank), as well as from a dismissal of its claim brought against Alvin Hornbacher, d/b/a Jamestown Livestock Sales. Swift brought suit against the Bank and Hornbacher for wrongful conversion of 85 head of cattle, which had been maintained in pens in Jamestown, North Dakota by one Donald Sholts. Counterclaims were filed by the defendants against Swift. These were dismissed by the court without submission to the jury. Cross appeals as to these dismissals are lodged by the defendants-counterclaimants.

The facts may be briefly summarized.

Donald Sholts was a cattle buyer, trader and feeder in Jamestown, North Dakota. Since January 1963 Sholts had been engaged primarily in purchasing

and fattening cattle on behalf of Swift. He sometimes purchased as many as 500 to 600 cattle at one time. Over the years, various contracts had been entered into between Swift and Sholts covering the cattle purchased. Two of the more recent contracts, dated December 15, 1966, and April 1, 1967, were received into evidence. Each contract recited that title to the cattle should remain in Swift at all times. There exists no definite proof as to how many of the 85 cattle in question were identifiable to either of these contracts.[1] Since 1963, Sholts purchased, fed and sold cattle for himself as well as Swift. He usually maintained his cattle in separate pens from those purchased for Swift. When Sholts purchased cattle for Swift he would take the bill of sale, health certificate and brand clearance in his own name. He would be reimbursed by Swift and receive for his services a commission of twenty-five cents per hundred weight. In his many transactions with Swift, Sholts never gave a bill of sale on the cattle to Swift.

In order to cover checks he had written to purchase cattle, Sholts customarily borrowed money from the Bank on a short term basis with the understanding that the Bank would be paid when he was reimbursed by Swift. To insure Sholts' loans, over the years the Bank took various chattel mortgages and, finally in 1965, with the advent of the Uniform Commercial Code, the Bank took a security agreement covering Sholts' livestock, feed and inventory.

In September 1967, the Bank inspected Sholts' pens and learned that they were 215 to 245 head of cattle short of their expected security. They found only 85 head in the pens. At this time, Sholts owed the Bank approximately $25,000. The Bank decided to exercise the power of sale under the security agreement over the 85 head of cattle. Sholts gave his consent but told the Bank representa-

tives that they would probably have trouble with Swift since the cattle belonged to Swift. The Bank president responded that they would deal with Swift later. On the same evening the Bank picked up the cattle and had them hauled to the defendant Alvin Hornbacher's place of business. The Bank sold the cattle to Hornbacher and gave a bill of sale. When Swift received knowledge of the sale, it attempted to block Hornbacher's further resale of the cattle. The latter action, as will be discussed, constituted the basis of Hornbacher's claim against Swift.

The trial court dismissed Swift's claim against Hornbacher, but submitted to the jury, as determinative of the issue of the Bank's alleged conversion, the questions whether Swift had title to the cattle; and whether the Bank had a valid lien on the cattle entitling it to repossession, or whether the Bank waived the same.

The evidence is undisputed that sometime prior to September 22, 1967, the date of repossession by the Bank, Swift had actually bought and paid for the 85 head of cattle and that they were being maintained by Sholts (who had been paid his commission as well as the cost of the cattle) in his pens on that date. Therefore, the primary question to be resolved is whether the Bank's security interest in the cattle, as of September 22, 1967, was subordinated to Swift's claim of ownership.

■ Resolution of this issue may be approached in various ways. We are satisfied, however, that its ultimate determination is governed by the Uniform Commercial Code.* We conclude that as of September 22, 1967, Swift owned the cattle free of the Bank's security interest and the Bank wrongfully repossessed and sold the cattle.

■■ We should observe that it is extremely questionable under the evi-

---

1. The record indicates that at one point, Sholts thought some of the 85 head of cattle taken by the Bank were included in the Swift contracts. R. 40.

* The Uniform Commercial Code was adopted in North Dakota in 1965 and became effective July 1, 1966.

dence whether Sholts at the time of the original purchase of the cattle involved, ever possessed more than a bare *legal* title. The testimony of Sholts himself established that he purchased the cattle on behalf of Swift. He paid for the cattle by borrowing from the Bank, and was later reimbursed by Swift. Sholts' testimony was competent to prove his agency. Motley v. Standard Oil Co., 61 N.D. 660, 240 N.W. 206 (1931). In the event Sholts took legal title as an agent in order to hold the cattle in trust for Swift, he could not pass on any equitable interest to the Bank. See Gussner v. Hawks, 13 N.D. 453, 101 N.W. 898 (1904); Odegard v. Haugland, 40 N.D. 547, 169 N.W. 170 (1918). As Professor Williston says, "Where the agent buys goods for his undisclosed principal title passes at once to the latter, and the agent acquired no title therein." 2 Williston on Contracts, § 286 n. 13 (3d ed. 1959); cf. Kert v. Endelman, 202 Mich. 289, 168 N.W. 423 (1918); Foley v. Nimocks, 175 Iowa 464, 157 N.W. 178 (Iowa 1916); Restatement (Second) of Agency, § 14K (1958).

However, for purposes of argument, we will assume the question of title was properly submitted to the jury, and that the jury resolved the question against Swift,[2] finding that Sholts had sufficient ownership, at the time of the original acquisition of the cattle, in order to convey an equitable interest in them to the Bank under the security agreement.

Assuming that the cattle were covered by the security agreement, the controlling issue then becomes whether Swift's purchase of the cattle was protected against the prior security interest of the Bank. The answer to this depends upon the terms of the security instrument itself and the application of the Uniform Commercial Code.

We find that the Bank, in recording the security instrument with the Secretary of State, failed to properly perfect its lien interest against a subsequent bona fide purchaser. In North Dakota under § 9–401(1) (N.D. Cent. Code § 41–09–40), the proper place to file, in order to perfect a security interest on "farm products," is with the register of deeds. On all other personalty, except fixtures, the proper place of filing is with the Secretary of State.

"Farm products" are defined in § 9–109(3) (N.D. Cent. Code § 41–09–09) as follows:

"'[F]arm products' if they are crops or livestock or supplies used or produced in farming operations or if they are products of crops or livestock in their unmanufactured states (such as ginned cotton, wool-clip, maple syrup, milk and eggs), and if they are in possession of a debtor engaged in raising, fattening, grazing or other farming operations. If goods are farm products they are neither equipment nor inventory;"

Sholts' "fattening" of livestock falls within the explicit terms of the above statutory provisions. Cf. Clovis Nat'l Bank v. Thomas, 77 N.M. 554, 425 P.2d 726 (N.M.1967). We hold the trial court erred in submitting the validity of the Bank's lien interest to the jury since we find as a matter of law that the Bank did not perfect its lien interest as required under the Uniform Commercial Code.[3]

---

2. For this reason, it is not necessary to discuss the Bank's claim that Swift is estopped to claim ownership by reason of the doctrine of equitable estoppel. Cf. Commercial Credit Corp. v. Dassenko, 77 N.D. 412, 43 N.W.2d 299 (N.D.1950); Rath Packing Co. v. Paul Blood Farms, Inc., 419 F.2d 13 (8 Cir. 1969).

3. The Bank argues that the "livestock" fed by Sholts were not "farm products" since Sholts was not involved in a "farming op-

eration." The argument is made that the cattle were in fact "inventory" and therefore the Bank's lien interest was properly perfected by filing the paper with the Secretary of State. Although we think this is a strained interpretation of plain words, assuming the Bank correct, the Bank must then meet the hurdle of § 9–307(1) (N.D.Cent.Code § 41–09–28), which reads:

"A buyer in ordinary course of business (subsection 9 of section 41–01–11)

Assuming Sholts had sufficient ownership to the cattle to "pledge" them as collateral, the Bank's security agreement of July 1966 was effective then only as long as the Bank itself required a regular accounting by Sholts. The Bank was fully aware of this. Once the cattle were sold and Sholts misused the proceeds, the Bank's failure to require an immediate accounting led directly to its loss. The Bank's records show that Sholts at all times was cooperative and that the Bank officials trusted him. This blind trust was brought to an abrupt end when the Bank found the gross discrepancy in the cattle maintained by Sholts in September 1967.

There exists an even stronger reason why the Bank's interest cannot prevail against Swift's ownership. The security agreement is an "inventory" contract which passes a security interest in "personal property now owned or hereafter at any time acquired" by Sholts. The terms of the instrument itself are not ambiguous. It includes all of Sholts' inventory and "all livestock and feed." It provides that the collateral will not be removed from Sholts' place of business unless Sholts gives written notice of the intention to remove the collateral and the Bank has given its written consent for its removal. Under the agreement, the borrower retains the title to the collateral with the understanding that he will account to the Bank for all proceeds upon the latter's request. Paragraph 6 of the security agreement recites:

"Borrower will not sell, lease or otherwise dispose of the Collateral *other than in the ordinary course of its business* at prices constituting the then fair market value thereof, or at the Minimum Release Price of such Collateral contained in any Supplement to Security Agreement wherein the Collateral concerned is described." (Emphasis ours.)

These terms are basic to most security arrangements between a lending concern and an individual selling merchandise in the ordinary course of business. 2 Gilmore, Security Interests In Personal Property §§ 26.1-.12, pp. 676–717 (1965).

■ Section 9–306(2) (N.D. Cent. Code § 41–09–27) reads:

"Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

By the terms of the security agreement, i. e. ¶ 6 set forth above, the Bank authorized the sale of the cattle. The president of the Bank testified that Sholts had "blanket permission" to sell the cattle.[4] Section 9–306(2) serves as codifi-

---

*other than a person buying farm products* from a person engaged in farming operations *takes free of a security interest* created by his seller even though the security interest is perfected and even though the buyer knows of its existence." (Emphasis ours.)

Section 9–307(1) applies only to unauthorized sales (see Official Comments of § 9–307). Thus if the sale was unauthorized, the Bank's perfected lien interest could only be protected under § 9–307(1) if the goods were in fact "farm products." See 2 Gilmore, Security Interests in Personal Property, §§ 26.10-.11, pp. 707–715 (1965). If they were "inventory" as the Bank argues, an unauthorized sale in the ordinary course of business

does not provide protection to the secured creditor as against a bona fide purchaser in the ordinary course of business.

4. The Bank's ledger entry of May 1, 1967, recites:

"$5,000.00 principal paid on note dated 10–24–66 and due 4–15–67, and Payment came from the sale of 20 steers averaging 1105 lbs. at a price of $23.50 per CWT.

"NEW: $9,800.00, secured, due 6–20–67, 7% interest.

"SECURITY: *510 head, which includes 62 head just purchased for Swift and Company, on which we would actually hold a mortgage until paid for by Swift and Company.*

**1104**

cation of the common law of waiver. United States v. Greenwich Mill & Elevator Co., 291 F.Supp. 609 (N.D.Ohio 1968); Vermilion County Production Credit Ass'n v. Izzard, 111 Ill.App.2d 190, 249 N.E.2d 352 (1969); Franklin Investment Co. v. Homburg, 252 A.2d 95 (D.C.Ct. of Appeals 1969); Clovis Nat'l Bank v. Thomas, *supra*. As in the instant case, where the creditor has given its consent to the debtor to sell the collateral, the purchaser in the ordinary course of business is held to take his title free and clear of any outstanding lien interest, perfected or not. Shortridge v. Sturdivant, 32 N.D. 154, 155 N.W. 20 (1915); Peterson v. St. Anthony & D. Elevator Co., 9 N.D. 55, 81 N.W. 59 (1899); New England Mtg. Sec. Co. v. Great Western Elevator Co., 6 N.D. 407, 71 N.W. 130 (1897).

■ Our decision leads us to conclude that the trial court erred in dismissing Swift's claim against Hornbacher. On the evening of September 22, 1967, under almost clandestine circumstances, Hornbacher purchased the cattle from the Bank. Regardless of Hornbacher's good faith and lack of knowledge of any wrongful conversion, the Bank had no title to convey to Hornbacher, by reason of the cattle belonging to Swift, and Swift may still follow the sale of the goods even to a bona fide third purchaser. See Hovland v. Farmer's Union Elevator Co., 67 N.D. 71, 269 N.W. 842 (1936); National Atlas Elevator Co. v. United States, 97 F.2d 940 (8 Cir. 1938). Cf. United States v. McClesky Mills, Inc., 409 F.2d 1216, 1219 (5 Cir. 1969). § 9–306, Official Comment 3 (N.D. Cent. Code § 41–09–27).

Cross appeals are filed by the Bank and Hornbacher on different claims. The Bank alleges damages against Swift in that Sholts had delivered cattle to Swift just prior to their repossession of the 85 head and that these other cattle were likewise covered by their security agreement. The essence of this claim falls short by reason of our previous discussion.

Hornbacher[5] alleges that Swift wrongfully prevented and obstructed his sale of the cattle to a commission company. Assuming these allegations to be true, the counterclaim was properly dismissed by reason of Swift's proper assertion of ownership to the 85 head of cattle.

The judgment in favor of the Bank and Hornbacher is reversed and the cause remanded as to Swift's claim against the Bank and Hornbacher for a new trial in accordance with the principles set forth herein; the dismissal of the counterclaims is affirmed.

"PURPOSE: For purchase of 62 coming yearlings just purchased for Swift and Company for which he should be fully re-imbursed by maturity date." (Emphasis ours.)

The Bank, over the years, had trusted Sholts to continue to account to the Bank as he was reimbursed by Swift for the cattle. A Bank official entered in his ledger as early as July 14, 1964:

"I inquired as to whether or not this contract with Swift could be assigned and he stated that it was not assignable. *We, therefore, would have to set* *up some type of an installment payment arrangement based on anticipated monthly returns.* I feel we could possibly go ahead on this type of a loan as long as our margin of security is watched very carefully. I have a great deal of faith in this individuals [sic] capabilities and feel that our moral risk is excellent." (Emphasis ours.)

5. William Finch, along with Hornbacher, was also a purchaser of the 85 head of cattle. He assigned his rights to Hornbacher prior to trial.